FOR PUBLICATION

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

NOV 2 2022

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| ANITA NOELLE GREEN, | No. 21-35228 |
| Plaintiff-Appellant, | D.C. No. 3:19-cv-02048-MO |
| v. | OPINION |
| MISS UNITED STATES OF AMERICA, LLC, DBA United States of America Pageants, a Nevada limited liability corporation, | |
| Defendant-Appellee. | |

Appeal from the United States District Court
for the District of Oregon
Michael W. Mosman, District Judge, Presiding

Argued and Submitted March 8, 2022
Portland, Oregon

Before: Susan P. Graber, Carlos T. Bea, and Lawrence VanDyke, Circuit Judges.

Opinion by Judge VanDyke;
Concurrence by Judge VanDyke;
Dissent by Judge Graber

# SUMMARY[*]

## First Amendment

The panel affirmed the district court's summary judgment in favor of Miss United States of America, LLC, in an action brought by Anita Green, who self-identifies as an openly transgender female, alleging that the Miss United States of America pageant's "natural born female" eligibility requirement violated the Oregon Public Accommodations Act ("OPAA").

The district court held that the First Amendment protected the Pageant's expressive association rights to exclude a person who would impact the group's ability to express its views. The panel agreed that summary judgment for the Pageant was correct, but reached this conclusion not under the First Amendment's protection of freedom of association but rather under the First Amendment's protection against compelled speech.

The panel held that the First Amendment, which ensures that "Congress shall make no law . . . abridging the freedom of speech," extends its protections to theatrical productions. Beauty pageants fall comfortably within this ambit. The panel noted that it is commonly understood that beauty pageants are generally designed to express the "ideal vision of American womanhood." The panel held that the Pageant's message cannot be divorced from the Pageant's selection and evaluation of contestants. The Pageant would not be able to communicate "the celebration of biological women" if it were forced to allow Green to participate. The First Amendment affords the Pageant the ability to voice this message and to enforce its "natural born female" rule. The panel concluded that forcing the Pageant to accept Green as a participant would fundamentally alter the Pageant's expressive message in direct violation of the First Amendment.

The panel rejected the arguments of Green and amici that there would be no First Amendment violation if Green was allowed to participate. First, Green argued that the Pageant never actually expressed any viewpoint relating to the inclusion of biological males who identify as women. The panel held that this argument

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

concerned the First Amendment protection as to the Pageant's freedom to associate, which is not the ground reached in this decision. And even if the argument were relevant to the Pageant's free speech rights, it was a contention rejected by case law. Second, Green and amici argued that the forced inclusion would not significantly burden the Pageant's ability to advocate for its viewpoints. The panel disagreed. Green's insistence that there was no meaningful difference between Green and any of the Pageant's cisgender female contestants was precisely the opposite statement of the one that the Pageant sought to make. The panel held that if the Pageant were no longer able to enforce its "natural born female" rule, even if a given transgender contestant never openly communicated to anyone outside of the Pageant their transgender status and were otherwise fully indistinguishable from the "natural born female" contestants, the Pageant's expression would nonetheless be fundamentally altered. Thus, the Pageant's desired expression of who can be an "ideal woman" would be suppressed and thereby transformed through the coercive power of the law if the OPAA were to be applied to it. The final say over the content of its message ultimately lies with the Pageant. Third, the panel held that contrary to Green's and the dissent's argument, it does not matter that the Pageant is a for-profit entity that engages in commerce. That alone is not enough to strip the Pageant of its First Amendment rights. The Pageant expresses its message in part through whom it chooses as its contestants, and the First Amendment affords it the right to do so.

The panel held that the district court erred in refusing to apply *Hurley v. Irish-American Gay, Lesbian, and Bisexual Group of Boston*, 515 U.S. 557 (1995) (addressing whether a Massachusetts public accommodations law could be used to force a private parade to include a message that the organizers opposed), to this case. The panel held that it was impossible not to perceive the strong parallels between this case and what drove the Supreme Court's analysis in *Hurley*. The Pageant is engaging in an inherently expressive activity. Forcing the inclusion of Green in the Pageant would be to require the Pageant to eliminate its "natural born female" rule, which in turn would directly affect the message that is conveyed by every single contestant in a Miss United States of America pageant.

The panel held that the district court erred in analyzing the Pageant's free speech claim under the framework established in *United States v. O'Brien*, 391 U.S. 367 (1968). The facts underlying *O'Brien* were materially different than this case. The *O'Brien* framework governs First Amendment claims when evaluating government regulations that only have an incidental effect on protected speech – generally when speech and nonspeech elements are combined in the same course of conduct. The panel held that the restriction on expression when applying the OPAA to the Pageant cannot properly be described as merely "incidental." Forcing the pageant to include

Green would directly impact the message that the Pageant currently expresses regarding the celebration of natural born females, and therefore, *O'Brien* was inapplicable here.

The panel held that application of the OPAA would force the Pageant to include Green and therefore alter its speech. Such compulsion is a content-based regulation and warrants strict scrutiny. The panel held that as a threshold matter, the application of the OPAA in this context lacks the compelling state interest. The State of Oregon has offered only "eliminating discrimination against LGBTQ individuals" as a compelling interest, but this broad formulation alone cannot suffice. The courts have a long-standing hesitation to enforce anti-discrimination statutes in the speech context. Application of the anti-discrimination law to the Pageant here would necessarily impact its message. Applying the proper Supreme Court guidance in this case required prohibiting the application of the OPAA to eliminate the Pageant's "natural born female" rule.

Finally, the panel addressed the dissenting opinion. The panel held that the dissent proposed a radical expansion of the constitutional avoidance doctrine that would force the Pageant to continue operating under a siege of litigation irrespective of any constitutional protections. This runs directly counter to the First Amendment's right, not just to speak, but to be free of protracted speech-chilling litigation. Expanding the constitutional avoidance doctrine to force the Pageant to engage in possibly years of additional, costly, and attention-diverting litigation before it can effectuate its constitutional rights would make a mockery of those rights.

Judge VanDyke separately concurred to respond to the dissent and explain why the Pageant was protected not only from compelled speech, but also from forced association by being required to include Green in its pageantry. He would hold that the Pageant is an expressive association, and the forced inclusion of an unwanted member would impact the organization's ability to express its desired viewpoints. Given this, the OPAA could not survive under the requisite heightened scrutiny. Judge VanDyke would hold that the Pageant's association claim, like its free speech claim, was meritorious.

Judge Graber dissented. She wrote that the federal doctrine of constitutional avoidance, Oregon's application of the same principle, and the *Erie* doctrine, emphatically supported, if not required, that the panel decline to decide the constitutionality of the Oregon statute without first deciding whether the statute even applied to Defendant. The district court, and the majority opinion, contradicted

those principles.  By assuming that the OPAA applied to Defendant, the majority risked issuing an unconstitutional advisory opinion and flouted a longstanding tradition of judicial restraint in federal courts.  In addition, the case arose under state law, and principles of comity strongly supported the conclusion that, just as the Oregon courts would, this court should first decide whether the statute applied.  Moreover, the majority opinion was fatally inconsistent when it held both that the OPAA is assumed to apply to Defendant and that Defendant is so selective that it is not offering a place or service to members of the public.  If the court were to reach Defendant's as-applied First Amendment defense, Judge Graber would hold that Green should prevail on the present record.  The OPAA does not compel speech and it does not violate Defendant's right to associate.  Judge Graber would vacate the judgment and remand the case to the district court to determine whether the OPAA applied to Defendant before this court addresses any constitutional concerns regarding the application of the statute.

---

## COUNSEL

---

Shenoa Payne (argued), Shenoa Payne Attorney at Law PC, Portland, Oregon, for Plaintiff-Appellant.

Cody S. Barnett (argued), Alliance Defending Freedom, Lansdowne, Virginia; Bryan D. Neihart and Katherine L. Anderson, Alliance Defending Freedom, Scottsdale, Arizona; John J. Bursch, Alliance Defending Freedom, Washington, D.C.; John Kaempf, Kaempf Law Firm PC, Portland, Oregon; for Defendant-Appellee.

Jeffrey R. White and Amy L. Brogioli, American Association for Justice, Washington, D.C., for Amicus Curiae American Association for Justice.

Carson L. Whitehead, Assistant Attorney General; Benjamin Gutman, Solicitor General; Ellen F. Rosenblum, Attorney General; Office of the Oregon Attorney General, Portland, Oregon; for Amicus Curiae State of Oregon.

Peter C. Renn and Nora Huppert, Lambda Legal Defense and Education Fund Inc., Los Angeles, California, for Amici Curiae Lambda Legal Defense and Education Fund, Transgender Legal Defense and Education Fund, and National Center for Lesbian Rights.

Christina Stephenson, Meyer Stephenson, Portland, Oregon; Phil Goldsmith, Law Office of Phil Goldsmith, Portland, Oregon; for Amicus Curiae Oregon Trial Lawyers Association.

Eugene Volokh; Anastasia Thatcher, So-Young Kim, and Aaron Boudaie, Certified Law Students; First Amendment Clinic, UCLA School of Law, Los Angeles, California, for Amicus Curiae Libertarian Law Council and Institute for Free Speech.

Lauren R. Adams, Women's Liberation Front, Washington, D.C.; Lauren A. Bone, Women's Liberation Front, Glendale, Wisconsin; for Amicus Curiae Women's Liberation Front.

Anna St. John, Hamilton Lincoln Law Institute, Washington, D.C., for Amicus Curiae Pinnacle Peak Pictures.

Michael A. Cantrell, Assistant Solicitor General; Vincent M. Wagner, Deputy Solicitor General; Nicholas J. Bronni, Solicitor General; Leslie Rutledge, Attorney General; Office of the Arkansas Attorney General, Little Rock, Arkansas; Steve Marshall, Attorney General, Office of the Alabama Attorney General; Mark Brnovich, Attorney General, Office of the Arizona Attorney General; Lawrence G. Wasden, Attorney General, Office of the Idaho Attorney General; Jeff Landry, Attorney General, Office of the Louisiana Attorney General; Lynn Fitch, Attorney General, Office of the Mississippi Attorney General; Austin Knudsen, Attorney General, Office of the Montana Attorney General; Douglas J. Peterson, Attorney General, Office of the Nebraska Attorney General; John M. O'Connor, Attorney General, Office of the Oklahoma Attorney General; Alan Wilson, Attorney General, Office of the South Carolina Attorney General; Jason R. Ravnsborg, Attorney General, Office of the South Dakota Attorney General; Ken Paxton, Attorney General, Office of the Texas Attorney General; for Amici Curiae State of Arkansas, State of Alabama, State of Arizona, State of Idaho, State of Louisiana, State of Mississippi, State of Montana, State of Nebraska, State of Oklahoma, State of South Carolina, State of South Dakota, and State of Texas.

Aaron T. Martin, Martin Law & Mediation PLLC, Phoenix, Arizona; for Amici Curiae Past Pageant Participants.

VANDYKE, Circuit Judge:

## I.

Anita Green, who self-identifies as "an openly transgender female," sued the Miss United States of America pageant, alleging that the Pageant's "natural born female" eligibility requirement violates the Oregon Public Accommodations Act ("OPAA"). The district court granted the Pageant's motion for summary judgment, holding that the First Amendment protects the Pageant's expressive association rights to exclude a person who would impact the group's ability to express its views. We conclude that the district court was correct to grant the Pageant's motion for summary judgment, but reach this conclusion not under the First Amendment's protection of freedom of association but rather under the First Amendment's protection against compelled speech.

## II.

Defendant Miss United States of America, LLC, is a Nevada corporation that operates beauty pageants throughout the United States. This includes an annual national pageant, which is livestreamed and performed before a live audience. Contestants in the national pageant compete in multiple rounds of competition. The early rounds require contestants to answer questions from the judges, perform on stage in patriotic outfits, and dance to a choreographed routine while wearing a sash that displays the Pageant's logo. The top-rated performers advance to the semi-

2

finals, where they again compete in similar competitions and are judged for traits such as "poise" and "grace." The top three semi-finalists continue to the final round. The final round includes onstage questions, and in the past has included prompts such as "[w]hat will you do to … promote your platform on a national level?" and "[w]hy is the image you portray on your personal social media accounts important as a titleholder?" The top-scoring contestant is crowned Miss United States of America. The Pageant also promotes these contestants—especially the winner—on its own social media accounts. Moreover, winning contestants receive direct economic benefits in the form of a "prize package" that includes, among other items, gift certificates, beauty products, and clothing.

Like essentially all beauty pageants, Miss United States of America has eligibility requirements for who can compete. *See* Hilary Levey Friedman, *Here She Is: The Complicated Reign of the Beauty Pageant in America* 6 (2020) ("[B]eauty pageants are *exclusionary* in a number of dimensions …."). The "Miss" division, which Green applied to, requires among other things that contestants be "between 18–28 years of age," have "never posed nude in film or print media," and not be married or have given birth. Finally, and most relevant to our case, contestants must also be "a natural born female."

The Pageant enforces these requirements. For example, one applicant was rejected for having posed nude. Another was rejected for including "photographs

3

and language which were inconsistent with USOA Pageants' message." The Pageant explained that those photographs and language were "inconsistent with [the Pageant's] vision and message we wish to associate with and does not coincide with United States of America Pageants' efforts to produce community role models."

As explained in the briefing, Plaintiff Anita Green claims to have been "assigned the gender of male at birth," but "came out as transgender at the age of 17." Green later took medication to alter hormone levels and underwent cosmetic surgery in which Green's male anatomy was reconstructed to appear as female anatomy.

Green then began competing in female beauty pageants. These included back-to-back entrances in the Miss Montana USA pageant, which ended when Green was no longer eligible because of that pageant's age requirement. Green then moved to Oregon and continued competing, including in the Miss Earth pageants in Oregon and Nevada.[1]

In late 2018, Green and Tanice Smith—Miss United States of America's national director—began exchanging messages on Facebook. The two began discussing Miss United States of America's Oregon pageant. Smith explained that the 2018 Oregon pageant had already occurred, but that Green could either wait until next year's pageant or try to represent another state at the national pageant.

---

[1] Green was crowned the 2018 Miss Earth USA Elite Oregon titleholder.

After Smith sent Miss United States of America's rules, Green wrote "[y]ou know I'm transgender, right?" and "[y]our rules seem to discriminate against transgender women." Smith responded that she did not know that Green identified as transgender, and explained that Miss United States of America is a "natural pageant," implicitly referencing the Pageant's "natural born female" rule. After informing Green that the Pageant did not anticipate changing this eligibility requirement, Smith offered to help Green find "a pageant you would qualify for." Green responded by writing "[w]ell, I'll talk to my attorney about this then because discrimination is unacceptable."

Notwithstanding the Pageant's eligibility requirements, Green applied to compete. After the Pageant denied Green's application, Green sued. Green alleged that the Pageant violated the OPAA by discriminating based on gender identity. *See* Or. Rev. Stat. § 659A.403.[2]

The Pageant moved to dismiss, arguing in part that the application of OPAA violated the Pageant's freedom of speech and freedom of association rights under the First Amendment. After oral argument, the district court converted the motion to dismiss into a motion for summary judgment so that the parties could "engage in limited discovery and … submit supplemental briefing on the question of whether

---

[2] At the time, the OPAA did not explicitly cover "gender identity," but did include "sexual orientation." But neither party disputes that the OPAA's statutory definition of "sexual orientation" extended to include Green's claim.

5

Miss USA is an 'expressive association'" to evaluate the Pageant's freedom of association claim. After the subsequent filings, the district court granted the Pageant's motion for summary judgment, holding that the Pageant had a First Amendment freedom of association right to exclude Green.

The district court denied the Pageant's freedom of speech claim before ruling on its freedom of association claim. In rejecting the Pageant's speech claim, the district court first concluded that *Hurley v. Irish-American Gay, Lesbian, and Bisexual Group of Boston*, 515 U.S. 557 (1995), did not control the outcome of this case. The court explained that the state court in *Hurley* "misapplied the public accommodations law in a way that transformed it from a conduct-regulating, content-neutral law that did not target speech into a law that directly regulated speech based on its content." But unlike in *Hurley*, "a public accommodations law like OPAA, applied in the manner contemplated by its text, affects expression only incidentally, if at all."

After distinguishing *Hurley*, the district court determined that the Pageant's decision to exclude Green was "expressive conduct." The court then applied the framework laid out in *United States v. O'Brien*, 391 U.S. 367 (1968), to determine if the application of the OPAA could survive despite its "incidental limitations on First Amendment freedoms." The court held that the application of the OPAA to the Pageant's "natural born female" rule was permissible because the statute is both

"unrelated to the suppression of free expression" and "incidentally restricts [the Pageant's] expressive conduct in a way no further than essential."

But the court went on to conclude that Miss United States of America's freedom of association right "trump[s] application of OPAA." It determined that the Pageant was predominately an expressive association; that the forced inclusion of Green would significantly affect the Pageant's ability to express its viewpoints; and that the Pageant's expressive association interests outweighed Oregon's interest in enforcing the OPAA. Green then appealed the district court's summary judgment ruling.

## III.

On appeal, the Pageant reasserts its claims that the forced inclusion of Green would unconstitutionally infringe on both its free association and free speech rights. Because we hold that the application of the OPAA to the Pageant in this regard violates its free speech rights, we need not reach its freedom of association claim.

## A.

We review grants of summary judgment de novo. *Alpha Delta Chi-Delta Chapter v. Reed*, 648 F.3d 790, 796 (9th Cir. 2011). In First Amendment cases, "an appellate court has an obligation to 'make an independent examination of the whole record' to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'" *Bose Corp. v. Consumers Union of U.S., Inc.*, 466

U.S. 485, 499 (1984) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 285 (1964)). In doing so, we may affirm the grant of summary judgment on any grounds supported by the record. *McQuillion v. Schwarzenegger*, 369 F.3d 1091, 1096 (9th Cir. 2004).

**B.**

The First Amendment ensures that "Congress shall make no law … abridging the freedom of speech." U.S. Const. amend. I. The Fourteenth Amendment has extended this principle to the states. *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 547 (1975). Our First Amendment jurisprudence has long understood "speech" to extend "beyond written or spoken words as mediums of expression," *Hurley*, 515 U.S. at 569, reaching so far as to include "various forms of entertainment and visual expression as purely expressive activities," *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1060 (9th Cir. 2010). Unsurprisingly, these protections extend to theatrical productions that "frequently mix[] speech with live action or conduct." *Conrad*, 420 U.S. at 558.

Beauty pageants fall comfortably within this ambit.[3] As with theater, cinema, or the Super Bowl halftime show, beauty pageants combine speech with live performances such as music and dancing to express a message. And while the

---

[3] *See Pageant*, *Encyclopedia Britannica*, https://www.britannica.com/art/pageant ("a large-scale, spectacular theatrical production or procession").

8

content of that message varies from pageant to pageant, it is commonly understood that beauty pageants are generally designed to express the "ideal vision of American womanhood." Margot Mifflin, *Looking for Miss America: A Pageant's 100-Year Quest to Define Womanhood* 9 (2020). In doing so, pageants "provide communities with the opportunity to articulate the norms of appropriate femininity both for themselves and for spectators alike." Nina Brown et al., *Perspectives: An Open Introduction to Cultural Anthropology* 389 (2d ed. 2020).

Equally important to this case is understanding the method by which the Pageant expresses its view of womanhood. Given a pageant's competitive and performative structure, it is clear that *who* competes and succeeds in a pageant is *how* the pageant speaks. Put differently, the Pageant's message cannot be divorced from the Pageant's selection and evaluation of contestants. This interdependent dynamic between medium and message is well-established and well-protected in our caselaw. *See, e.g.*, *Anderson*, 621 F.3d at 1062 ("The process of expression through a medium has never been thought so distinct from the expression itself that we could disaggregate Picasso from his brushes and canvas, or that we could value Beethoven without the benefit of strings and woodwinds."); Brief for the American Civil Liberties Union of Washington et al. as Amici Curiae Supporting Defendant at 22, *United States v. Waggy*, 936 F.3d 1014 (9th Cir. 2019) ("Picketing is accompanied by the conduct of holding a placard; leafleting is accompanied by the conduct of

9

standing on a sidewalk …. Calling it something other than speech does not make it so.").[4] This means that, for certain expressive productions such as pageants, there is no daylight between speech and speaker.

Miss United States of America and amici have offered an abundance of examples to this effect, but the most prominent may be Broadway's smash-hit *Hamilton*. The musical utilizes hip-hop music and lyrics to detail the rise and fall of Founding Father Alexander Hamilton[5] and has garnered widespread attention from the public and critics alike. Some of the musical's popularity stemmed from its casting choices, namely the decision to cast the predominately white Founding Fathers with actors of color. That expressive decision was widely—though not universally[6]—applauded. And it's just as widely recognized that this choice was central to the message of the musical itself. The "choice to enlist a mostly non-white

---

[4] This idea also belies Green's argument that the Pageant loses First Amendment protections because it "is comprised of individual contestants … that are first and foremost competitors." This argument overlooks the importance of competition for expressing a view on the feminine ideal. As amici explain, "the competitive aspect of the pageant is essential to drawing the contestants together and spurring them on to greater achievement and renown than they would otherwise attain on their own."

[5] *Cf. Trafigura Trading LLC v. United States*, 29 F.4th 286, 287 (5th Cir. 2022).

[6] *See, e.g.*, Camille Moore, *'Hamilton' and the erasure of white supremacy*, The Mich. Daily (Oct. 15, 2020), https://www.michigandaily.com/michigan-in-color/hamilton-and-the-erasure-of-white-supremacy/ ("If the story of the Founding Fathers were to be told based on the way America looks now, they should still be portrayed as rich, white men who exploit and oppress low-income, Black people. By erasing that their race had an active role in the power they had to oppress others, we downplay the racism that they wrote into our country's foundation.").

10

cast … paints a picture of a more diverse nation whose history truly belongs to every one of her inhabitants." Zack Krajnyak, *Hamilton: Why the Cast is Mostly People of Color*, Screenrant (Oct. 3, 2020), https://screenrant.com/hamilton-musical-cast-people-color-black-reasons/. And this message could be delivered *only* by excluding certain people from performing. As one commentator explained:

> Now, what would the musical look like if Alexander Hamilton wasn't played by Lin-Manuel Miranda, and Aaron Burr wasn't played by Leslie Odom, Jr, but instead the characters were played by two capable, talented white actors? The show would likely still be entertaining, but the context and the conversation would change. … It's a completely different show.

Zeba Blay, *No, The 'Hamilton' Casting Call for 'Non-White' Actors Is Not Reverse Racism*, HuffPost (Mar. 31, 2016, 12:30 PM), https://www.huffpost.com/entry/no-the-hamilton-casting-call-for-non-white-actors-is-not-reverse-racism_n_56fd2c83e4b0daf53aeed9b9.

Lin-Manuel Miranda—the creator and lead actor of *Hamilton*—agreed, explaining that the decision to cast a diverse set of actors was integral to the musical itself.

> Our goal was: This is a story about America then, told by America now, and we want to eliminate any distance—our story should look the way our country looks. Then we found the best people to embody these

parts.  *I think it's a very powerful statement without having to be a statement.*[7]

Rob Weinert-Kendt, *Rapping a Revolution*, N.Y. Times (Feb. 5, 2015), https://www.nytimes.com/2015/02/08/theater/lin-manuel-miranda-and-others-from-hamilton-talk-history.html (emphasis added).   All of this means that *Hamilton*'s expressive message was inescapably interwoven with its casting decisions—whom the musical decided to cast and whom the musical decided to exclude.  Had some anti-discrimination statute been applied to *Hamilton* forcibly to include white actors, the show simply would not be able to express the message it desired.  But such a use of the State's power would violate "the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message."  *Hurley*, 515 U.S. at 573.

Many pageants deploy a similar approach.  For example, "Miss Asian America" attempts to honor "Asian culture, beauty, and intelligence," in part by limiting its contestants to only those who have at least one-fourth Asian ancestry.  Miss Asian Global & Miss Asian America Pageant,

---

[7] The notable *exception* to the diverse casting was King George III, who was played by a white actor.  As other commentators have explained, this casting decision not only has "great visual representation," but helps show the King as "a relic of what was before; someone who wants to keep the status quo because it works for him, rather than change it for the better of others."  James Hunt, *Hamilton: Why King George is the Only White Main Character*, Screenrant, (July 28, 2020), https://screenrant.com/hamilton-musical-king-george-character-white-reason/.

https://www.missasianglobal.com/apply/step1/ (last visited June 15, 2022), https://www.missasianglobal.com/about/ (last visited June 15, 2022). The "Christian Miss" pageant strives to "help[] young women shine bright in this world," in part by limiting contestants to only those who can affirm certain Christian doctrines. Christian Miss, https://www.christianmiss.com/national-pageant (last visited June 22, 2022), https://www.christianmiss.com/about (last visited June 22, 2022). Finally, "Miss International Queen" hopes "[t]o create equal[ity] and acceptance in society" for individuals who identify as transgender, in part by limiting contestants to members of that community. Miss International Queen, https://www.missinternationalqueen.com/contest (last visited June 14, 2022).

This is likewise true for Miss United States of America. Miss United States of America's stated message is to "encourage women to strive to ACHIEVE their hopes, dreams, goals, and aspirations," and to "EMPOWER Women, INSPIRE others, & UPLIFT everyone!" There is also an important communal element to Miss United States of America, as the network of current and former contestants forms "an elite sisterhood that gives support and encouragement to inspire each delegate to be the best version of herself!" Miss United States of America determined, as did every other pageant mentioned above, that including and excluding certain people

was the best means necessary to express and achieve this message.[8]  The Pageant

would not be able to communicate "the celebration of biological women" if it were

forced to allow Green to participate.[9]  As the district court explained, the Pageant's

decision to limit contestants to "natural born female[s]" undoubtedly conveys that

message, because:

> Someone viewing the decision to exclude transgender women (and cisgender males) from a beauty pageant would likely understand that the pageant organizers wished to convey some message about the meaning of gender and femininity, and would probably also grasp the specific implication that the pageant organizers did not believe transgender women qualified as female.

---

[8] Contrary to Green's assertion, this is no less true even though the Pageant allows the contestants some autonomy over their message through certain decisions such as "their choice of gown and swimsuit, answers to on-stage questions, and individualized platforms."  Again, a certain level of freedom for the contestants is inevitable in the competitive medium that the Pageant deploys.  Moreover, the First Amendment does not require "a speaker to generate, as an original matter, each item featured in the communication.  Cable operators, for example, are engaged in protected speech activities even when they only select programming originally produced by others." *Hurley*, 515 U.S. at 570.

[9] What messages or viewpoints an organization decides to *exclude* can be as, or even more, important than those it chooses to express.  "*The New Republic* and *National Review* are known as liberal and conservative magazines, respectively, precisely because they generally don't publish opinions from the other side (except perhaps on rare occasions)." Eugene Volokh, *The Law of Compelled Speech*, 97 Tex. L. Rev. 355, 362 (2018).  This means that "compelling speakers to include certain material in their coherent speech product, thus barring them from distributing a speech product that contains just the content that they want it to contain," is "presumptively unconstitutional." *Id.* at 360–61.

The First Amendment affords the Pageant the ability to voice this message, and to enforce its "natural born female" rule.[10] "The First Amendment mandates that we presume that speakers, not the government, know best both what they want to say and how to say it." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 790–91 (1988). "Compelling individuals to mouth support for views they find objectionable violates" core First Amendment protections, "and in most contexts, any such effort would be universally condemned." *Janus v. Am. Fed'n of State,*

---

[10] The dissent objects to this conclusion by arguing that the Pageant cannot rely on the fact "that it has a discriminatory belief that it hopes to further through its business." Lumping the Pageant in with the unenviable company of a "white supremacist" bowling alley operator and a "militant feminist" hotel owner, the dissent argues that these organizations could not discriminate against black bowlers and men as an expression of their views, so neither can the Pageant discriminate against individuals who identify as women. The analogy is as misguided as it is loaded. The Pageant is limiting who can compete on stage *as performers* in delivering a message to an audience. There is simply no parallel between that dynamic and a bowler at a bowling alley or a patron simply staying at a hotel. All we hold here is that Oregon cannot use the OPAA to force Miss United States of America to conduct the pageant in a manner that compels it to speak a message it "would rather avoid." *Hurley*, 515 U.S. at 573. The dissent's analogies would have some purchase only if this were a case about the Pageant preventing Green from watching the pageant as an *audience* member, not participating as an active and public part of the pageantry. To make the point from the other direction: the dissent's analogies involving Oregon forcing the bowling alley operator or hotel owner to "decorate" their establishments at odds with their views are much closer to this case because, unlike bowlers and hotel guests, performers like Green *are* the pageantry, and the pageantry is the message. Such analogies only underscore our well-supported conclusion that this type of compelled expression runs afoul of the First Amendment.

*Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2463 (2018). And at the risk of belaboring the point:

> There can be no clearer example of an intrusion into the internal structure or affairs of an association than a regulation that forces the group to accept members it does not desire. Such a regulation may impair the ability of the original members to express only those views that brought them together.

*Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984).

Forcing the Pageant to accept Green as a participant would fundamentally alter the Pageant's expressive message in direct violation of the First Amendment. Nevertheless, Green and amici argue there would be no First Amendment violation if Green was allowed to participate. None of their arguments are persuasive.

**i.**

First, Green and amici argue that Miss United States of America never *actually* expressed any viewpoint relating to the inclusion of biological males who identify as women. As Green asserts, the Pageant "fails to demonstrate it had a long-standing, central, and sincerely held belief related to transgender women."

The problem with this claim is that it fails on two fronts. First, this argument is leveled against the claim that the Pageant constitutes an expressive association that merits First Amendment protection as to its freedom to associate, which is a ground that we do not reach here. Second, even if the argument were relevant to the Pageant's free speech rights, it is a contention that is rejected in the caselaw. In

16

*Hurley v. Irish-American Gay, Lesbian, and Bisexual Group of Boston*, the Supreme Court held that the forced inclusion of a group promoting homosexuality (GLIB) in a St. Patrick's Day parade violated the parade sponsors' rights of free expression. 515 U.S. 557, 565–66 (1995). The Supreme Court reached this conclusion, even though the sponsors had been "rather lenient in admitting participants" in past parades and had not created a parade that "isolate[d] an exact message as the exclusive subject matter of the speech." *Id.* at 569–70. Moreover, the Court even recognized that its speculation about the particular reasoning for the sponsors' exclusion of GLIB might "give[] the Council credit for a more considered judgment than it actively made." *Id.* at 574. But nonetheless, the speaker's decision "to exclude a message it did not like … is enough to invoke its right as a private speaker to shape its expression …." *Id.*[11] In short, the decision of a speaker "not to propound a particular point of view"—regardless whether it is thoroughly reasoned, long-held,

---

[11] Notably, the Court reached this holding notwithstanding a lower court's conclusion that the sponsors' exclusion of GLIB was "'paradoxical' … since 'a proper celebration of St. Patrick's and Evacuation Day require[d] diversity and inclusiveness." *Hurley*, 515 U.S. at 562 (citations omitted). The perceived inconsistency of an "unsophisticated expression" was not a bar to the First Amendment's protection, because the free expression rights attached regardless. *Id.* at 574; *see also Boy Scouts of Am. v. Dale*, 530 U.S. 640, 651 (2000) (instructing in the expressive association context that "it is not the role of the courts to reject a group's expressed values because they disagree with those values or find them internally inconsistent").

or well-articulated—"is presumed to lie beyond the government's power to control." *Id.*

The same holds true here. The Pageant allows only "natural born female[s]" to compete and enforces this requirement, and repeatedly maintains that it does not believe that biological males who identify as female are women. In fact, the Pageant explains that it communicates these views on womanhood *every* time it uses the word "woman," because the fact that the Pageant "does not adjectivize the word woman is part of the message: the word 'woman' so naturally means 'born female' that the Pageant does not need or use qualifiers."[12] This is more than sufficient under current caselaw to substantiate the Pageant's decision not to communicate a message contrary to that position. "The fact that the organization does not trumpet its views from the housetops … does not mean that its views receive no First Amendment protection." *Dale*, 530 U.S. at 656.

## ii.

Alternatively, Green and amici argue that the forced inclusion would not significantly burden the Pageant's ability to advocate for its viewpoints. Because Green "presents as stereotypically female," so the argument goes, "[t]here is no

---

[12] This argument is especially salient for controversies regarding transgenderism. As our sister circuit has noted, an individual's use or omission of certain words and phrases in this context often reflects a "struggle over the social control of language in a crucial debate about the nature and foundation, or indeed real existence, of the sexes." *Meriwether v. Hartop*, 992 F.3d 492, 508 (6th Cir. 2021) (citation omitted).

18

meaningful distinction between plaintiff and any of defendant's cisgender female contestants." And Green seeks to participate "in the same means and manner" and for the "same reasons" as the other contestants, so that participation would not pose any significant burden on the Pageant or its message.

We disagree. First, Green's insistence that "[t]here is no meaningful difference between plaintiff and any of defendant's cisgender female contestants" is precisely the *opposite* statement of the one that the Pageant seeks to make. Green's inclusion in the Pageant would undeniably alter that message. This is true regardless whether there are any discernable visible differences at all between Green and any of the Pageant's "cisgender female contestants." To understand why this is so, we return to *Hurley*. In *Hurley*, the Supreme Court refused to apply a Massachusetts public accommodations law to the South Boston St. Patrick's Day parade because the First Amendment protected an expressive message that was less particularized than the Pageant's message is here. It noted that "a narrow, succinctly articulable message is not a condition for constitutional protection, which if confined to expressions conveying a 'particularized message' would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schöenberg, or Jabberwocky verse of Lewis Carroll." *Hurley*, 515 U.S. at 569 (citation omitted).

How the First Amendment's protection for non-particularized messages applies to this case merits further elaboration. Like a parade, a pageant operates by

19

"combining multifarious voices" to make some "sort of collective point." *Id.* at 568–69. Because the inclusion of the plaintiff's banner in *Hurley* would have affected the parade's collective message, the parade organizers were entitled to decide if that message should be included.[13] Similarly, the inclusion of a contestant who is not a "natural born female" would impact the Pageant's ability to express its collective point. This remains true even if the message sent by a non-natural born female's inclusion into the Pageant is "not wholly articulate"—the Pageant nonetheless still has the constitutional right to exclude the message for "whatever the reason." *Id.* at 574, 575. And because of this, the Pageant's control over the message remains the same regardless whether those contestants intentionally broadcasted the fact that they are not biological females, told only the Pageant, or even if they tried to keep that fact completely to themselves.

Bolstering this claim is the fact that there would be at least one *obvious* impact on the Pageant's message: Requiring Miss United States of America to allow Green to compete in its pageants would be to explicitly require Miss United States of America to remove its "natural born female" rule from its entry requirements. This in turn would directly affect the message that is conveyed by every single contestant

---

[13] The Supreme Court further explained how low this threshold is for a message to warrant protection. It concluded that a "private speaker does not forfeit constitutional protection … by failing to edit their themes to isolate an exact message as the exclusive subject matter of the speech." *Hurley*, 515 U.S. at 569–70.

in a Miss United States of America pageant. With the Pageant's "natural born female" rule, every viewer of a Miss United States of America pageant receives the Pageant's message that the "ideal woman" is a biological female, because every contestant is a "natural born female." If the Pageant were no longer able to enforce its "natural born female" rule, even if a given transgender contestant or contestants never openly communicated to anyone outside of the Pageant their transgender status and were otherwise fully indistinguishable from the "natural born female" contestants (at least as presented in the Pageant)—and more fundamentally, even if *no* transgender contestants were to enter a Miss United States of America pageant—the Pageant's expression would nonetheless be fundamentally altered. Without the "natural born female" rule, viewers would be viewing a fundamentally different pageant from that which presently obtains: one which could contain contestants who are not "natural born female[s]." Thus, the Pageant's desired expression of who can be an "ideal woman" would be suppressed and thereby transformed through the coercive power of the law if the OPAA were to be applied to it.

The final say over the content of its message ultimately lies with the Pageant. The Supreme Court in *Hurley* did not insist on knowing the exact reason why the parade organizers wished to exclude the parade float that promoted homosexuality. Instead, it explained that "whatever the reason, it boils down to the choice of a

21

speaker not to propound a particular point of view, and that choice is presumed to lie beyond the government's power to control." *Hurley*, 515 U.S. at 575.

Finally, it is simply incorrect to assert that the inclusion of only a single participant would not significantly affect the speaker's message. "Speech must be viewed as a whole, and even one word or brush stroke can change its entire meaning." *Brush & Nib Studio, LC v. City of Phoenix*, 448 P.3d 890, 909 (Ariz. 2019). "For example, in *Hurley*, the Supreme Court determined that one banner in a parade of 20,000 participants changed the expressive content of the entire parade." *Id.* This was because the parade's "overall message is distilled from the individual presentations along the way, and each unit's expression is perceived by spectators as part of the whole." *Hurley*, 515 U.S. at 577. That observation seems especially apt here. The Pageant defines "women" as being natural born females. The most natural and effective way for the Pageant to express this message is through its uniform selection of *only* biological females as pageant contestants. Therefore, allowing for the inclusion of even a single non-biological female as a "woman" would certainly be an expressive decision revising the Pageant's definition.

Applying this same reasoning to other First Amendment contexts demonstrates the implausibility of the argument that the inclusion of Green would not significantly affect the Pageant's message. No one could seriously claim that there would be no "substantial" effect on religious exercise if the Little Sisters of the

22

Poor were required to provide only a single contraceptive, *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2376 (2020); if a Seventh-Day Adventist was forced to work only a single Sabbath, *Sherbert v. Verner*, 374 U.S. 398, 403 (1963); or if a Christian baker were ordered to bake a custom wedding cake for only one homosexual couple, *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1724 (2018). Yet this is precisely the reasoning Green and amici advance in their arguments. We properly rejected those arguments in other First Amendment contexts, and again do so here.[14]

---

[14] Contrary to the dissent's assertion that Free Exercise cases "have no bearing on the appropriate analysis," the discussion provided here demonstrates the uniform treatment that the caselaw has given these kinds of arguments. In fact, the Supreme Court recently concluded that there is significant parity in the operations of the Free Speech and Free Exercise Clauses when reviewing a football coach's claim that the local school district had violated both his free exercise and free expression rights when he was fired for engaging in private religious speech. *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407 (2022). The Supreme Court explained that the "Clauses work in tandem" and "provide[] overlapping protection" and rebuked our court for treating these Clauses as hermetically sealed, "separate units." *Id.* at 2421, 2426. It held that a more "natural reading of th[e] sentence" in the First Amendment that contains both Clauses communicates that they work towards the same ends. *Id.* at 2426. Furthermore, the Court applied the same analysis under both Clauses when evaluating whether the school district had satisfied the proper level of scrutiny to justify its intrusion on the coach's rights. *Id.* at 2426–32 (explaining that the Court's analysis does not depend on "[w]hether one views the case through the lens of the Free Exercise or Free Speech Clause," as the result was the same under "the First Amendment's double protection"). Thus, the reasoning of Free Exercise caselaw is directly applicable to the concern raised in this case: that even a purportedly minor modification of the Pageant's message by Green's inclusion can result in a significant impact on the Pageant's overall message. That outcome is exactly what

23

**iii.**

Nor, contrary to Green's and the dissent's argument, does it matter that the Pageant is a for-profit entity that engages in commerce. No one disputes that the Pageant is a for-profit corporation that generates revenue from advertising, fees, and other activities, but that alone is not enough to strip the Pageant of its First Amendment rights.[15] "It is well settled that a speaker's rights are not lost merely because compensation is received; a speaker is no less a speaker because he or she is paid to speak." *Riley*, 487 U.S. at 801; *see also Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 761 (1976) (describing as "beyond serious dispute" the idea "that speech does not lose its First Amendment protection because money is spent to project it, as in a paid advertisement of one form or another").

And while the Pageant does have commercial elements, those elements cannot strip it of its First Amendment rights. A non-commercial "mission" is wholly

---

the First Amendment's protection of free expression guards against: compelling a party to convey a message it does not wish to articulate.

[15] The dissent's extensive discussion of the Pageant's various revenue streams and commercial activity only belabors this uncontested point. We could, for example, outline in equal depth the various revenue streams of a for-profit newspaper (subscriptions, advertisements, premium content, etc.), but no one would doubt that the newspaper is entitled to First Amendment protections. *See Sullivan*, 376 U.S. at 265–66 (dismissing as "wholly misplaced" the notion that a newspaper company loses First Amendment protections for publishing a "paid, 'commercial' advertisement").

unnecessary for First Amendment protections to apply—to require otherwise would be to denigrate the right of a businessman to speak. Regardless of whether Miss United States of America is motivated by the purse, or instead the promotion of purely philosophical notions of what it is to be a woman—or some mix of motivations—its right to speak on these matters is protected.

Even if a non-commercial "mission" was required, the Pageant would still prevail in this respect. The widespread recruitment of contestants may increase revenue, but it likewise increases the Pageant's ability to serve as an "important site[] for the construction of national feminine identity." Sarah Banet-Weiser, *The Most Beautiful Girl in the World: Beauty Pageants and National Identity* 31 (2005). This important focus on producing pageantry also explains why the Pageant would occasionally reject potential contestants, and therefore forfeit potential revenue. Even though money is involved, the expressive message remains an obvious priority. Here, no less than with other commercial expression, "[e]ven when that expression is for sale—*Hamilton* tickets do not come cheap—people are paying for the expression." Brian Soucek, *The Constitutional Irrelevance of Art*, 99 N.C. L. Rev. 685, 746 (2021) (citation omitted). Our court has recognized that numerous other entities, including "publishers and purveyors of books and newspapers, concert promoters, cable television franchisers," and many others do not lose First Amendment protection merely because of "their sale of expression." *IDK, Inc. v.*

25

*Clark Cnty.*, 836 F.2d 1185, 1194 (9th Cir. 1988); *Masterpiece Cakeshop*, 138 S. Ct. at 1745 (Thomas, J., concurring in part and concurring in the judgment) (noting that "this Court has repeatedly rejected the notion that a speaker's profit motive gives the government a freer hand in compelling speech"). Given the sweeping protection for expressive entities that similarly engage in commerce, we have no difficulty concluding that Miss United States of America merits the same.

## iv.

Finally, it seems clear that Green's argument proves too much. In addition to sexual identity, the OPAA covers numerous other protected categories, including "sex," "marital status," and "age." *See* Or. Rev. Stat. § 659A.403. Miss United States of America has eligibility requirements around each of these categories, so it would seem that Green's argument would apply with equal force, for example, to the Pageant's decision to exclude a male who identifies as a man. The same holds true for an octogenarian who would like to compete in the Pageant, as well as a pregnant mother of five. The Pageant would seemingly have to include any and all of these contestants, even though the Pageant has decided that these classes of individuals are not properly suited to express the Pageant's message on who is the "ideal woman." And this logic does not stop at eligibility requirements, but would seemingly apply even to the judging of contestants. As amici have noted, at least one jurisdiction's anti-discrimination law includes "personal appearance" as a

26

protected category, which, if applied in this context, would cast into doubt the very possibility of a *beauty* pageant at all. *See* D.C. Code § 1402.31(a).

* * *

In short, Miss United States of America expresses its message in part through whom it chooses as its contestants, and the First Amendment affords it the right to do so.

## C.

All of this is confirmed by *Hurley*. As previously noted, *Hurley* addressed whether a Massachusetts public accommodations law could be used to force a private parade to include a message that the organizers opposed. Boston allowed a private organization to coordinate an annual St. Patrick's Day parade on Boston's streets, which over the years grew into a large production. *Hurley*, 515 U.S. at 560–61. One year the organization received an application from "GLIB," a group who wanted to "express pride in their Irish heritage as openly gay, lesbian, and bisexual individuals." *Id.* at 561. After the organizers denied the request, GLIB sued. The organizers responded by arguing the forced inclusion of GLIB would violate the First Amendment by forcing the parade to communicate a conflicting message. *Id.* at 563. The Supreme Court unanimously agreed and invalidated the application of the law.

27

First, the Supreme Court observed that a parade is "a form of expression, not just motion, and the *inherent expressiveness*" of its pageantry affords it First Amendment protections. *Id.* at 568 (emphasis added). It next examined GLIB and concluded that its "participation as a unit in the parade was equally expressive." *Id.* at 570. GLIB was formed for the purpose of celebrating "its members' identity as openly gay, lesbian, and bisexual descendants of the Irish immigrants" and "to show that there are such individuals in the community." *Id.* This would therefore have the unmistakable purpose of communicating this idea under the banner of the St. Patrick's Day parade.

The Supreme Court then specified the exact nature of the exclusion. Unlike normal applications of a public accommodations law, the statute here was used to admit "GLIB as its own parade unit carrying its own banner." *Id.* at 572. The problem with this was that because "every participating unit affects the message conveyed by the private organizers, the state courts' application of the statute produced an order essentially requiring petitioners to alter the expressive content of their parade." *Id.* at 572–73; *see also* Soucek, *The Constitutional Irrelevance of Art*, *supra*, at 745 (arguing that application of the law "would force a change to the organizers' message no less than a law that dictated what elements a composer could include in their score"). The Court then struck down the application of the law,

28

holding that to allow such forced inclusion would unconstitutionally impinge on the parade's First Amendment right to tailor its own speech.

It is impossible not to perceive the strong parallels between this case and what drove the Supreme Court's analysis in *Hurley*. As already explained, the Pageant is engaged in an inherently expressive activity. And forcing the inclusion of Green in a Miss United States of America pageant would be to require the Pageant to eliminate its "natural born female" rule, which in turn would directly affect the message that is conveyed by every single contestant in a Miss United States of America pageant. For this reason, we conclude the district court erred in refusing to apply *Hurley* to this case.

**D.**

While *Hurley* governs this case, the district court elected to analyze the Pageant's free speech claim under the framework established in *United States v. O'Brien* and denied its claim. For the reasons stated below, we disagree.

First, it must be noted that the facts underlying *O'Brien* are materially different than this case. O'Brien was charged for willfully burning his draft card in violation of federal law. *O'Brien*, 391 U.S. at 370. O'Brien argued the law violated his First Amendment right to free speech because he burned the card publicly in hopes of influencing "others to adopt his antiwar beliefs." *Id.* The Supreme Court rejected O'Brien's First Amendment argument in part because the law requiring

29

people not to destroy their draft card "is in no respect inevitably or necessarily expressive." *Id.* at 385. Put differently, the law was consistent with the First Amendment because *not* destroying the draft card was not itself a statement in support of the war, or indeed any statement about the war at all.

The *O'Brien* framework governs First Amendment claims when evaluating government regulations that have "only an incidental effect on protected speech." *Dale*, 530 U.S. at 659. This generally occurs "when 'speech' and 'nonspeech' elements are combined in the same course of conduct." *O'Brien*, 391 U.S. at 376. Under this "intermediate standard of review," *Dale*, 530 U.S. at 659, a government regulation can survive:

> [1] if it is within the constitutional power of the Government; [2] if it furthers an important or substantial governmental interest; [3] if the governmental interest is unrelated to the suppression of free expression; and [4] if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*O'Brien*, 391 U.S. at 377.

When the district court applied the fourth part of this test to the Pageant, it held that the OPAA only "incidentally restricts [the Pageant's] expressive conduct in a way no further than essential." But as described above, the restriction on expression when applying the OPAA to the Pageant cannot properly be described as merely "incidental." Instead, forcing the Pageant to include Green would directly

30

impact and contradict the message that the Pageant currently expresses regarding the celebration of natural born biological females. *O'Brien* is inapplicable here.

The Supreme Court reached an analogous conclusion in *Hurley*. Despite acknowledging that the Massachusetts public accommodation law was normally "well within the State's usual power," the Supreme Court found that its application to the parade posed a significant First Amendment problem. *Hurley*, 515 U.S. at 572. As it explained, "once the expressive character of both the parade and the marching GLIB contingent is understood, it becomes apparent that the state courts' application of the statute had the effect of declaring the sponsors' speech itself to be a public accommodation," which was beyond the scope of the state's power. *Id.* at 573. By the statute's direct operation on the parade sponsors' speech itself, the Supreme Court found that it had violated the sponsors' right "to choose the content of his own message." *Id.*; *see also Dale*, 530 U.S. at 659 (finding *O'Brien* inapplicable because there could be no "incidental effect on protected speech" when the challenged law "directly and immediately affect[ed]" the Boy Scouts' First Amendment rights). Here too, as explained, forcing the inclusion of Green into a Miss United States of America pageant would "directly and immediately affect[]" the Pageant's expression. As the district court correctly noted, "[t]he facts here present a binary choice," either Green competes or not. But unlike in *O'Brien*, *both* choices inevitably express a message. Not accepting Green reinforces the Pageant's

31

message that the ideal model of femininity is necessarily biologically female, while being forced to include Green necessarily contradicts that message. Either way, a message is being communicated. Thus, there is no daylight between the message and the admission of contestants to the Pageant. And such daylight is necessary for a law to have a merely "incidental" rather than a "direct[] and immediate[]" effect on the speech in question.[16] The district court therefore erred in analyzing this case under *O'Brien*.

## E.

Application of the OPAA would force the Pageant to include Green and therefore alter its speech. Such compulsion is a content-based regulation under our caselaw, and as such warrants strict scrutiny. *See Riley*, 487 U.S. at 795 ("Mandating speech that a speaker would not otherwise make necessarily alters the content of the speech. We therefore consider the Act as a content-based regulation of speech."); *see also Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 759 (9th Cir. 2019) (Ikuta, J., concurring in the result) ("A government regulation 'compelling individuals to speak a particular message' is a content-based regulation

---

[16] This explains why the dissent's highlighting the distinction between Green's activism and status is inapposite. As explained in more detail in Section III.B.ii, *supra*, the inclusion of a transgender woman, whether an activist or one whose status is not publicly known, compels the Pageant to abandon its "natural born female" requirement, which itself conveys a message about how the Pageant views the "ideal woman." Thus, *O'Brien* is inapplicable here; the Pageant's choice of contestants is the message that is directly, not incidentally, changed by application of the OPAA.

32

that is subject to strict scrutiny ….” (quoting *Nat’l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2372–73 (2018))).

Content-based regulations “are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests.” *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Given the heightened concerns over chilling free speech, the Supreme Court has demanded that “precision … be the touchstone” of any law regulating speech. *Nat’l Inst. of Fam.*, 138 S. Ct. at 2376 (quoting *NAACP v. Button*, 371 U.S. 415, 438 (1963)) (cleaned up). Additionally, there must be “*even more* immediate and urgent grounds” to uphold a law that forces “involuntary affirmation of objected-to beliefs.” *Janus*, 138 S. Ct. at 2464 (internal quotation marks omitted) (emphasis added) (quoting *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 633 (1943)). These requirements are daunting, and the OPAA’s application here does not meet the challenge.

As a threshold matter, the application of the OPAA in this context lacks the requisite compelling interest. Green and amici point to Oregon’s stated reasons for passing the OPAA, which include remedying discrimination that inflicts “serious mental, financial, and emotional harm on transgender individuals.” But this formulation is insufficient, as the “First Amendment demands a more precise analysis” than the “high level of generality” offered here. *Fulton v. City of*

*Philadelphia*, 141 S. Ct. 1868, 1881 (2021). *Fulton* addressed Philadelphia's decision to no longer partner with a faith-based foster care service over that service's belief that "marriage is a sacred bond between a man and a woman" and its corresponding decision not to certify same-sex couples. *Id.* at 1875. The Supreme Court held that Philadelphia's refusal to work with the agency burdened the group's religious exercise rights and was not a generally applicable practice, and thus warranted strict scrutiny. *Id.* at 1877. In its briefing, Philadelphia asserted three compelling interests for its non-discrimination policies: "maximizing the number of foster parents, protecting the City from liability, and ensuring equal treatment of prospective foster parents and foster children." *Id.* at 1881. The Court rejected that characterization of the City's interests as insufficiently precise, explaining that the question "is not whether the City has a compelling interest in enforcing its non-discrimination policies generally, but whether it has such an interest in denying an exception to [this specific foster care agency]." *Id.*

Once properly framed, the Supreme Court found Philadelphia's reasons lacking, and the same is true here. The state of Oregon has offered only "eliminating discrimination against LGBTQ individuals" as a compelling interest, but this broad formulation alone cannot suffice. Green offers nothing more precise, and instead admits that Miss United States of America has done nothing to prevent Green from participating in other pageants or to prevent Green from expressing any message by

34

any other means.  *See Hurley*, 515 U.S. at 577–78 (rejecting the notion that homosexual members of the Massachusetts community would have their views "destroyed in the absence of the challenged law" and noting that GLIB failed to identify "any other legitimate interest … in support of applying the Massachusetts statute" to require the parade to accept the group).

Bolstering this argument is the courts' long-standing hesitation to enforce anti-discrimination statutes in the speech context.  "[A]s compelling as the interest in preventing discriminatory conduct may be, speech is treated differently under the First Amendment."  *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 755 (8th Cir. 2019).  This means that while "antidiscrimination laws are generally constitutional, … a 'peculiar' application that required speakers 'to alter their *expressive content*' was not."  *Id.* (cleaned up) (citation omitted); *see also Christian Legal Soc'y v. Walker*, 453 F.3d 853, 863 (7th Cir. 2006) ("[T]he Supreme Court has made it clear that antidiscrimination regulations may not be applied to expressive conduct with the purpose of either suppressing or promoting a particular viewpoint.").  Application of the anti-discrimination law to the Pageant here would necessarily impact its message.  When considering antidiscrimination interests in the special context of First Amendment expressive activity, the Supreme Court has directed lower courts to "prevent the government from requiring [private organizations'] speech to serve as a public accommodation for others."  *Telescope*

35

*Media*, 936 F.3d at 755. Honoring that dynamic in this case requires prohibiting the application of the OPAA to eliminate Miss United States of America's "natural born female" rule.

## IV.

Our dissenting colleague objects not only to the merits of our ruling, but also to our decision to reach the merits at all. The dissent claims to have unearthed a previously undiscovered procedural issue that means we cannot, or at least should not, reach the First Amendment claim. The alleged problem is that the district court ruled on the Pageant's First Amendment claims without first determining if the OPAA applies to the Pageant. According to the dissent, this would render any ruling on the constitutional merits improper and instead requires that we remand the case for the district court to decide whether the OPAA applies.

But there is a reason that neither party, nor the numerous amici in this case, even *hinted* at the "error" that the dissent identifies[17]—it does not exist. Every day in jurisdictions across this country, courts assume answers to predicate questions to resolve claims on legal and constitutional grounds. Instead of utilizing this commonplace practice to work toward a just and speedy resolution of this case, the dissent proposes a radical expansion of the constitutional avoidance doctrine that

---

[17] The parties filed supplemental briefing on the issue only after an order from this court sua sponte raised it and required a response. *See* ECF No. 74.

would force the Pageant to continue operating under a siege of litigation irrespective of any constitutional protections. This runs directly counter to the First Amendment's right, not just to speak, but to be free of protracted speech-chilling litigation, which courts have repeatedly recognized in a variety of analogous contexts. Both the district court and our court have now concluded that the First Amendment prevents Green from forcing the Pageant to change its message by including Green. Expanding the constitutional avoidance doctrine to force the Pageant to engage in possibly years of additional, costly, and attention-diverting litigation before it can effectuate its constitutional rights would make a mockery of those rights.

## A.

The dissent argues that *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), *requires* that we remand the case to the district court, because that is what "an Oregon court would do with respect to this state-law statutory claim." But nothing in the dissent supports that categorical assertion. The dissent begins with a list of cases that stand for the uncontroversial yet unilluminating principle that Oregon courts will often—perhaps generally—elect to resolve a case on statutory grounds before addressing constitutional issues when both are before the court. But the dissent goes much further than Oregon courts have gone, effectively reading in a de facto exhaustion requirement that all antecedent non-constitutional questions must

37

be addressed before the court can reach any constitutional question. We are aware of no jurisdiction that has such a rule; Oregon courts certainly do not.

Instead, Oregon courts have shown flexibility in resolving cases involving multiple claims. And nothing in Oregon cases indicates that a court must force parties needlessly to litigate an unraised claim in the First Amendment context just to comply with some preferred order of operations. For example, in *Neumann v. Liles*, the Oregon Supreme Court addressed a First Amendment defense to a defamation claim. 369 P.3d 1117 (Or. 2016). In that case, the parties elected not to raise "the issue of whether [defendant's] statements are protected under Article I, section 8, of the Oregon Constitution." *Id.* at 1120 n.4. This created a possible problem for the Oregon Supreme Court, since it would ordinarily "look to our state constitution *before* addressing any federal constitutional issues." *Id.* at 1123 n.6 (emphasis added). This left the court with two options: (1) remand the case and force the parties to address an unlitigated but possibly dispositive state-law issue that the court preferred to address before any federal constitutional issue; or (2) resolve the case on the federal constitutional issue already raised. The court chose the latter. *See id.* at 1126 (holding that the defendant's statement "is an expression of opinion on matters of public concern that is protected under the First Amendment"). Nor was this a one-off occurrence. *See, e.g., Church at 295 S. 18th St., St. Helens v. Emp. Dep't*, 28 P.3d 1185, 1190 (Or. Ct. App. 2001); *Klein v. Or. Bureau of Lab. &*

38

*Indus.*, 410 P.3d 1051, 1064 (Or. Ct. App. 2017), *cert. granted*, *judgment vacated*, 139 S. Ct. 2713 (2019).

*State v. Barrett*, 255 P.3d 472 (Or. 2011), offers another example.  In *Barrett*, the Oregon Supreme Court explicitly decided to resolve the case on a constitutional claim without addressing an accompanying statutory claim.  Instead of wading into a statutory issue that was "less clear," the court concluded "that this is an appropriate occasion in which to address the victim's constitutional claims without also addressing or resolving" the statutory claim.  *Id.* at 477.[18]

The dissent's citation to cases involving the OPAA does nothing to alter this conclusion.  In *Schwenk v. Boy Scouts of America*, 551 P.2d 465 (Or. 1976), the Oregon Supreme Court resolved the case by concluding the OPAA did not apply to the defendant and therefore declined to address the defendant's First Amendment arguments.  *See id.* at 469 n.5.  But that was in a case where the interpretation and application of the OPAA was fully briefed by the parties, so the court could immediately resolve the case on those grounds.  *See id.* at 466–67.  *Schwenk* says nothing about what an Oregon appellate court would do when it could *not* resolve

---

[18] To its credit, the dissent acknowledges *Barrett* as cutting against the general rule it purports to ascertain.  But it attempts to distinguish *Barrett* because there the Oregon Legislature had "created a clear and expedited procedural path for a victim [of stalking] to assert claims for the violation of her constitutional rights."  Far from distinguishing *Barrett*, this only demonstrates that the State of Oregon has, like the federal courts have, shown a special concern for resolving First Amendment claims expeditiously.

the claim on statutory grounds but could immediately resolve it on constitutional grounds by vindicating a constitutional protection.

*Lahmann v. Grand Aerie of Fraternal Order of Eagles*, 43 P.3d 1130 (Or. Ct. App. 2002), is similarly unilluminating. There, an Oregon trial court below ruled on summary judgment that a male-only group was required to admit women under the OPAA. *Id.* at 1130–31. On appeal, the Oregon appellate court thought that whether the OPAA applied to the group turned on a disputed issue of material fact and therefore remanded the case to the trial court. *Id.* at 1137–38. But *Lahmann* differs from our case because the parties there disputed whether the public accommodation law applied, while the parties here do not. The group in *Lahmann* had argued on appeal that "the Public Accommodation Act was not intended to reach the membership policies of private organizations." *Id.* at 1131. The Pageant here has done no such thing, and actually explained that it "did not dispute, for purposes of the summary judgment motion, that it is a public accommodation subject to Oregon's Act."[19]

Regardless, nowhere in *Lahmann* did the court purport to establish any rule about the OPAA and constitutional claims. Instead, it determined that a remand was appropriate only "[i]n this case." *Id.* at 1137 (emphasis added). The court thought

---

[19] In doing so, the Pageant was clear that it was stipulating to this fact for purposes of summary judgment, but reserved the right to dispute this fact, if necessary, at later stages of the litigation. *See* Fed. R. Civ. P. 56(c)(1)(A).

there was conflicting evidence in the record about whether the Eagles were "in the business of selling memberships and whether their membership criteria are unselective." *Id.* This fact could potentially "bear on the constitutional issue" of whether application of the OPAA "violates the right of association," *id.* at 1138, so the court reasoned that further factual development could be beneficial—not just to a threshold issue, but also the constitutional issue itself. In contrast, here we find the current record on appeal sufficient to resolve the case on the Pageant's free speech claim.

All said, a common theme emerges: Oregon courts do not handcuff themselves to the rigid methodological hierarchy proposed by the dissent. Instead, Oregon courts utilize their discretion in each case to determine how best to resolve the matter. We follow this same course of action and conclude that resolution of the case under the Pageant's constitutional claim is the best path forward.[20]

**B.**

Hedging against the idea that the caselaw can shoulder the heavy burden of its categorical command, the dissent alternatively argues that even if we can decide

---

[20] The dissent also expresses worry over the opinion being advisory, primarily since it relies on an assumption "not definitively supported by the extant record." Of course, that is true of any and every motion to dismiss (where no facts are supported by the record), so this concern cannot alone be enough to render an opinion advisory. It is beyond dispute that this decision impacts "real people involved in a real controversy, not hypothetical requests for an advisory opinion." *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1141 (9th Cir. 2000) (en banc).

this case, we should not. The primary concern voiced by the dissent is the doctrine of constitutional avoidance, or the idea that a court should resolve a case, when possible, on statutory grounds before reaching any constitutional question. No one disputes the "long tradition of constitutional avoidance," but the dissent would stretch the doctrine beyond recognition.

If every non-constitutional claim must be exhausted before reaching a constitutional issue, it is not clear how any constitutional question could ever be decided on a pre-trial motion, which happens routinely. Nor is it clear how courts could retain any level of discretion about what order to decide issues when resolving cases. Given these far-reaching implications of the dissent's argument, it is unsurprising that this view of constitutional avoidance finds no support from other courts.

The Eleventh Circuit, for example, had a case much like this one where it had to determine if Amazon violated a public accommodations law by excluding a Christian ministry from its charity program. Instead of first determining if the statute even applied to Amazon, the Eleventh Circuit resolved the claim on First Amendment grounds. It explained that "[w]e have not determined if non-physical spaces, like websites, qualify as places of public accommodation," but it did not need to resolve that question "because we find [Plaintiff's] claim *fails regardless* on First

Amendment grounds." *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 6 F.4th 1247, 1256 n.12 (11th Cir. 2021) (emphasis added).

The Eleventh Circuit is not alone in assuming that a place qualifies as a public accommodation in order to address the underlying legal claims. *See Boy Scouts of Am. v. D.C. Comm'n on Hum. Rts.*, 809 A.2d 1192, 1196 (D.C. 2002) (resolving the case on First Amendment grounds after assuming "without deciding that the Human Rights Act was intended to reach a membership organization such as the Boy Scouts as a 'place of public accommodation'"); *Adams ex rel. Harris v. Boy Scouts of Am.-Chickasaw Council*, 271 F.3d 769, 778 (8th Cir. 2001) ("Like the district court, we find it unnecessary to decide whether the camp was a place of public accommodation because appellants' claim under § 2000a fails for other reasons.").

The Supreme Court has also bypassed a disputed and dispositive factual question at summary judgment to resolve the claim immediately on First Amendment grounds. In *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620 (1980), the Supreme Court invalidated a local ordinance that banned the solicitation of charitable contributions by organizations that did not use at least 75% of those funds for "charitable purposes." *Id.* at 622. The case was decided at the summary judgment stage, even though it was never definitely resolved whether the charity in question met the 75% threshold. *Id.* at 626–27. Before the Supreme Court, the locality argued that "summary judgment was improper because

43

there was an unresolved factual dispute concerning the true character of [the charity's] organization." *Id.* at 633. The Supreme Court rejected this argument, concluding that the charity was entitled to win on its First Amendment claim "even if there was no demonstration that [the charity] itself was one of these organizations." *Id.* at 634. In other words, the Supreme Court did exactly what our court does here: resolved the matter based on the First Amendment defense even though the parties had simply assumed the factual question of whether the ordinance applied to the charity in the first instance.

This happens with other constitutional claims as well. Until recently, it was commonplace for appellate courts—including our own—to assume that a law in question implicated the Second Amendment and then resolve the case on the constitutional merits of the claim.[21] When faced with the complicated factual question of "whether the proscribed weapons are in common use for lawful purposes like self-defense," the First Circuit punted, instead explaining:

> Mindful that "[d]iscretion is often the better part of valor," *United States v. Gonzalez*, 736 F.3d 40, 40 (1st Cir. 2013), we are reluctant to plunge into this factbound morass. In the end, "courts should not rush to decide unsettled issues when the exigencies of a particular case do not require such definitive measures." *Privitera v. Curran (In re Curran)*, 855 F.3d 19, 22 (1st Cir. 2017). For present purposes, we simply assume, albeit without deciding, that the Act burdens conduct

---

[21] The Supreme Court thoroughly rejected this framework in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), because it was "inconsistent with *Heller*'s historical approach and its rejection of means-end scrutiny." *Id.* at 2129.

44

that falls somewhere within the compass of the Second Amendment.

*Worman v. Healey*, 922 F.3d 26, 35–36 (1st Cir. 2019).  Our circuit recently did the same.  In *Duncan v. Bonta*, we addressed a Second Amendment challenge to a law that functionally banned "large-capacity magazines."  19 F.4th 1087 (9th Cir. 2021) (en banc), *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022).  In that case, the en banc majority faced the step-one question whether the Second Amendment covered conduct regulated by the statute.  It explained:

> In many cases raising Second Amendment challenges, particularly where resolution of step one is uncertain and where the case raises "large and complicated" questions, *United States v. Torres*, 911 F.3d 1253, 1261 (9th Cir. 2019), we have assumed, without deciding, that the challenged law implicates the Second Amendment.…  Accordingly, we follow the "well-trodden and 'judicious course'" of assuming, without deciding, that California's law implicates the Second Amendment.

19 F.4th at 1103 (citation omitted) (Graber, J.).  In short, our court elected to avoid a complicated question whether the Second Amendment applied to the regulated conduct and assumed that it did to resolve the claim on the constitutional merits.  If we were willing to do this with the Second Amendment, it is not clear why we would not do the same with the First.[22]

---

[22] The dissent disputes the relevance of our court's frequent (but now defunct) practice in Second Amendment cases of assuming, without deciding, that a party's right to bear arms is implicated by a statute.  In the dissent's view, a court that assumes that the facts of a case raise a colorable constitutional claim without deciding that the relevant constitutional provision necessarily applies conducts a

None of the three Supreme Court cases cited by the dissent supports its variation of the constitutional avoidance doctrine, nor do they bear direct relevance to this case. *Spector Motor Service, Inc. v. McLaughlin* involved a district court judgment in favor of the plaintiff on the grounds that a challenged tax statute did not apply to the plaintiff. 323 U.S. 101, 102 (1944). The Second Circuit ignored that ruling and simply assumed the challenged tax statute *did* apply to the plaintiff to resolve the case on the merits. *Id.* at 102–03. The Supreme Court vacated the judgment of the Second Circuit, in part because it "would not be called upon to decide any of these questions of constitutionality … if, *as the District Court held*, the statute does not at all apply." *Id.* at 104 (emphasis added). That is a different procedural posture than what we have before us, where the district court made no such ruling either way.

*Escambia County v. McMillan*, 466 U.S. 48 (1984) (per curiam), also has dispositive differences from our case. There, a district court invalidated an at-large election system under both constitutional and statutory grounds. *McMillan*, 466 U.S.

---

distinct inquiry from a court that assumes that a colorable statutory provision is implicated without affirmatively deciding whether the statute applies. But in both instances, courts are proceeding to the merits of the issue after having bypassed the threshold question by assuming that the facts alleged raise a colorable claim. Thus, this court's analysis in the Second Amendment context is certainly relevant. It demonstrates that, in deciding constitutional claims, we have been more than willing to make threshold applicability assumptions akin to what the dissent decries as improper here.

at 49. The Fifth Circuit had also found the election system unconstitutional, but in doing so it declined to review the district court's statutory rulings. *Id.* at 50. Because the district court's ruling "rested alternately upon the Voting Rights Act," the Supreme Court remanded the case to the Fifth Circuit to determine "whether the Voting Rights Act provides grounds for affirmance of the District Court's judgment." *Id.* at 51, 52. *McMillian* therefore supports the idea that a court of appeals should not affirm a district court's constitutional ruling without also addressing the statutory rulings; it does not speak to the situation where, like here, the district court's only ruling was constitutional.

Finally, *United States v. Locke* included "nonconstitutional questions actually decided by the lower court as well as nonconstitutional grounds presented to, but not passed on, by the lower court." 471 U.S. 84, 92 (1985). The Court began with "the nonconstitutional questions pressed below," *id.*, and then turned to constitutional analysis, *id.* at 103–10. It is again not clear how this directs our court today, given the fact that the district court here ruled solely on the Pageant's constitutional claims.

The cases cited by the dissent fail to support its ambitious conclusion. Had the district court ruled on the application of the OPAA to the Pageant, this would be a different case, much more similar to the cases cited by the dissent. But the district court did not, and the constitutional avoidance doctrine cannot be stretched so far as to apply to the case before us.

## C.

The dissent also claims that the "majority opinion is fatally inconsistent" in assuming that the OPAA applies while concluding that the Pageant is sufficiently selective in choosing its participants to merit First Amendment protection. But there is nothing inconsistent about reaching those two conclusions—Oregon courts that have interpreted the OPAA have alluded to situations where the OPAA could apply even if a party's First Amendment rights are implicated.

The OPAA is analyzed under the decades-old *Lahmann* test, which considers whether an organization is a "place of public accommodation" by asking: "(1) whether it is a business or commercial enterprise and (2) whether its membership policies are *so unselective* that the organization can fairly be said to offer its services to the public." *Abraham v. Corizon Health, Inc.*, 511 P.3d 1083, 1094 (Or. 2022) (emphasis added) (quoting *Lahmann*, 43 P.3d at 1137). Rather than state, as the dissent does, that "not offer[ing] a place or service to the public at all" is the general metric for determining if the OPAA applies, *Lahmann* suggests that the selectivity necessary for a business to be covered by the OPAA lies somewhere on the spectrum between providing full public access and operating under complete exclusivity.[23]

---

[23] The dissent itself acknowledges this elsewhere in its opinion, by stating that "[i]t is possible that, if Defendant is *sufficiently selective*, the OPAA does not apply to it" (emphasis added). But by acknowledging this, it is the dissent's analysis that is internally inconsistent—specifically, its conclusion that the Pageant may not be

48

And as already noted, the *Lahmann* court remanded for additional fact-finding on whether the OPAA applied, which substantiates this less categorical reading of the Oregon caselaw.

The dissent seemingly agrees that the OPAA can apply to organizations that are somewhat selective in the provision of their services—even citing to the recent decision by the Oregon Supreme Court so holding. *See Abraham*, 511 P.3d at 1091 (citing *Lahmann* favorably).[24] But, the dissent nonetheless criticizes the majority for "hold[ing] both that the OPAA is assumed to apply to Defendant and that

---

subject to the OPAA. When describing the selectivity permitted under the OPAA, the dissent distinguishes between selective private organizations and businesses, contending that the OPAA applies to the latter and not to the former. Yet the dissent spends pages of its First Amendment analysis explaining its view that Miss USA's *commercial* attributes are a reason to conclude that it does not merit First Amendment protection. We disagree with the dissent's view of how commercial attributes affect the First Amendment analysis. But the dissent's view that such attributes are the hook for OPAA applicability, together with the dissent's explicit recognition that the Pageant has those very attributes, is effectively a concession that the Pageant is bound by the OPAA. And this inconsistency is not resolved by the dissent's insistence that its First Amendment analysis is based on an assumption, because the Pageant's commercial attributes that the dissent discusses are not mere assumptions, but rather uncontested facts pulled directly from the record in this case. If the dissent were not to misconstrue Oregon caselaw and were to acknowledge the full scope of a business's protected right to free expression, we are confident that the dissent would have to accede to the holding we reach in our merits analysis of Miss USA's free expression rights.

[24] Notably, the Oregon Supreme Court reached this holding after it rejected the "defendant's contention that [the OPAA's reference to] services offered to the public [is] limited to services that [a]re offered on 'an indiscriminate or unscreened basis.'" *Abraham*, 511 P.3d at 1091.

Defendant is so selective that it is not offering a place or service to members of the public." We are not "holding" that Miss USA is bound by the OPAA. We instead believe that there are sufficiently clear grounds in Oregon caselaw under *Lahmann* and *Abraham* to suggest that the OPAA applies even though Miss USA selectively chooses whom its competitors will be. Indeed, *Lahmann* and *Abraham* are not the only Oregon cases to conclude that the OPAA could apply to a business that is selective and whose selectivity involves speech, like Miss USA. *See also Lloyds Lions Club of Portland v. Int'l Ass'n of Lions Clubs*, 724 P.2d 887, 889–91 (Or. Ct. App. 1986) (applying the OPAA to a non-profit community service organization *with membership criteria*). This clear support in Oregon law strongly supports our assumption that Miss USA is bound by the OPAA.

Thus, there is nothing unreasonable or contradictory about assuming that the OPAA could apply to the Pageant and then holding that such an application would violate its free expression rights. And as explained above, given that the OPAA's application to Miss USA would constitute a content-based regulation of Miss USA's speech that is not substantiated by a compelling interest, the strength of Miss USA's free expression rights necessitates that we conclude that Miss USA prevails on the merits of its claims.

**D.**

By attempting to expand the doctrine of constitutional avoidance, the dissent runs squarely into an equally well-established constitutional principle. A fundamental value of our First Amendment jurisprudence is the protection against the chilling of lawful speech. *See, e.g.*, *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting) ("I think that we should be eternally vigilant against attempts to check the expression of opinions that we loathe ...."); *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255–56 (2002).

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), explained how the mere *threat* of litigation can lead to self-censorship. In establishing an extremely speech-protective standard against certain libel claims, the Supreme Court explained:

> A rule compelling the critic of official conduct to guarantee the truth of all his factual assertions—and to do so on pain of libel judgments virtually unlimited in amount—leads to a comparable 'self-censorship.' Allowance of the defense of truth, with the burden of proving it on the defendant, does not mean that only false speech will be deterred. … Under such a rule, would-be critics of official conduct may be deterred from voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt whether it can be proved in court or fear of the expense of having to do so. They tend to make only statements which 'steer far wider of the unlawful zone.' … The rule thus dampens the vigor and limits the variety of public debate. It is inconsistent with the First and Fourteenth Amendments.

376 U.S. at 279; *see also Smith v. People of the State of Cal.*, 361 U.S. 147, 150–51 (1959).

51

As recognized in *Sullivan* and countless other cases, the First Amendment's protections extend to not only unconstitutional laws, but also to unnecessary *litigation* that chills speech. This is why federal courts have emphasized the importance of resolving First Amendment cases at the earliest possible junction. As the D.C. Circuit explained:

> In the First Amendment area, summary procedures are even more essential. For the stake here, if harassment succeeds, is free debate .... Unless persons … desiring to exercise their First Amendment rights are assured freedom from the harassment of lawsuits, they will tend to become self-censors.

*McBride v. Merrell Dow & Pharms. Inc.*, 717 F.2d 1460, 1467 (D.C. Cir. 1983) (citation omitted). Contrary to the dissent's speech-hostile version of constitutional avoidance, we follow a well-trodden path by reaching and deciding a dispositive First Amendment issue that will avoid forcing the parties through unnecessary and protracted litigation.

The First Amendment's overbreadth doctrine takes this principle even further, shielding *third parties* from unnecessary litigation when the First Amendment would resolve their potential claim. Modern overbreadth doctrine requires the invalidation of any law that "seeks to prohibit such a broad range of protected conduct." *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 796 (1984). This means that plaintiffs "are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial

52

prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973). To do so, they must show "a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court." *Taxpayers for Vincent*, 466 U.S. at 801. In other words, the overbreadth doctrine requires courts to assume and evaluate *purely hypothetical* fact patterns to vindicate First Amendment interests of parties not even before the court.[25]

Our circuit has acknowledged that, in light of the overwhelming importance of protecting expression, the overbreadth doctrine can operate as "an exception" to certain case and controversy requirements. *See S.O.C., Inc. v. Cnty. of Clark*, 152 F.3d 1136, 1142 (9th Cir. 1998) (citation omitted); *see also Broadrick*, 413 U.S. at 610–11; *Bigelow v. Virginia*, 421 U.S. 809, 815–16 (1975) (collecting cases). The reason for this deviation from the norm? An unwavering "interest in preventing an invalid statute from inhibiting the speech of third parties who are not before the Court." *Taxpayers for Vincent*, 466 U.S. at 800. "If the rule were otherwise, the contours of regulation would have to be hammered out case by case—and tested

---

[25] The doctrine has extended beyond purely speech to also protect the right of association. *See Broadrick*, 413 U.S. at 612 ("Overbreadth attacks have also been allowed where the Court thought rights of association were ensnared in statutes which, by their broad sweep, might result in burdening innocent associations.").

only by those hardy enough to risk criminal prosecution to determine the proper scope of regulation." *Dombrowski v. Pfister*, 380 U.S. 479, 487 (1965). The overbreadth doctrine was thus crafted with an explicit aim of limiting the chilling effect of litigation on free expression by expeditiously vindicating First Amendment rights—even for nonparties. It is not clear how the dissent can reconcile this well-established doctrine with the view of constitutional avoidance it propounds here.

That the dissent inaccurately characterizes how constitutional avoidance works—particularly with respect to the First Amendment—is further demonstrated by our court's well-established practice in trademark infringement cases. The heart of such cases is often the fact-intensive issue of consumer confusion. Yet under the federal courts' decades-old "*Rogers*" test, when an alleged infringing defendant makes the "threshold legal showing" that the supposed trademark infringement is protected by the First Amendment, it eliminates the need to reach the fact-bound consumer confusion issue at all. *See, e.g.*, *Gordon v. Drape Creative, Inc.*, 909 F.3d 257, 264 (9th Cir. 2018) (applying *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989)). Courts regularly apply the *Rogers* test in precisely the same procedural posture as this case: summary judgment. *See, e.g.*, *Gordon*, 909 F.3d at 268; *Mattel, Inc. v. MCA Recs., Inc.*, 296 F.3d 894 (9th Cir. 2002); *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 807 (9th Cir. 2003); *Twentieth Century Fox Television, a*

*division of Twentieth Century Fox Film Corp. v. Empire Distrib., Inc.,* 875 F.3d 1192, 1198 (9th Cir. 2017).

Indeed, the *Rogers* requirement that the First Amendment inquiry comes first is so well established that we have *reversed* a district court for failing to answer the predicate First Amendment issue before analyzing the statutory issue. *See VIP Prod. LLC v. Jack Daniel's Props., Inc.*, 953 F.3d 1170, 1175–76 (9th Cir. 2020) ("Because Bad Spaniels is an expressive work, the district court erred in finding trademark infringement without first requiring [Plaintiff] to satisfy at least one of the two *Rogers* prongs."). Although there would be nothing impermissible here had the district court reviewed whether OPAA applied as the dissent proposes, the reversal in *VIP Product* shows that the hard-and-fast rule urged by the dissent simply does not exist. In a variety of contexts, our court has a demonstrated practice of resolving claims on First Amendment grounds first instead of needlessly litigating possibly dispositive fact-bound questions, notwithstanding the dissent's categorical claims to the contrary.

Oregon itself has demonstrated this same commitment to resolving speech claims quickly by enacting its own anti-SLAPP laws. As explained by the Oregon courts:

> SLAPP is an acronym for strategic lawsuits against public participation. *See Neumann v. Liles*, 369 P.3d 1117 (Or. 2016). Anti-SLAPP statutes seek to minimize the effect of strategic suits intended to deter persons from expressing their views. *Id.* Their goal is to permit defendants who

55

are targeted for their statements to end such suits quickly and with minimal expense. *Id.*

*Handy v. Lane Cnty.*, 385 P.3d 1016, 1020 n.4 (Or. 2016); *see also Staten v. Steel*, 191 P.3d 778, 787 (Or. Ct. App. 2008) (explaining that Oregon's "legislators explained that [the anti-SLAPP law's] purpose is to provide for the dismissal of claims against persons participating in public issues, when those claims would be privileged under case law, before the defendant is subject to substantial expenses in defending against them"). The dissent notes the Pageant's anti-SLAPP motion but dismisses its importance because, if it turned out after further litigation that the OPAA did not apply, the anti-SLAPP motion itself could be resolved on non-constitutional grounds. But that ignores a central purpose of an anti-SLAPP statute: to avoid protracted litigation over threshold factual issues when the claim can be more quickly resolved on pure legal grounds.[26]

---

[26] It is important not to miss the startling real-world implications of the dissent's uniquely expansive conception of constitutional avoidance. If the musical *Hamilton* came to Oregon and someone seeking to play a part sued the production company under the OPAA, the production could not have the case dismissed on First Amendment or anti-SLAPP grounds without first fully adjudicating whether the OPAA applies to the production—including the attendant discovery and expense of litigating that "threshold" question. While no doubt the highly acclaimed *Hamilton* production could afford to pay for such litigation however long it drags on, it is easy enough to see how a smaller production company would consider cutting out performances—that is, stop speaking—in Oregon altogether to avoid a prolonged lawsuit.

This willingness to avoid the real-world costs of prolonged litigation by deciding constitutional issues is not only limited to the First Amendment context; it is recognized in other contexts as well. Qualified immunity is an example: "The basic thrust of the qualified-immunity doctrine is to free officials from the concerns of litigation …." *Ashcroft v. Iqbal*, 556 U.S. 662, 685 (2009). This is because the litigation process "exacts heavy costs in terms of efficiency and expenditure of valuable time and resources." *Id.*; *see also Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982) (observing that "there is the danger that fear of being sued will dampen the ardor of all but the most resolute, or the most irresponsible [public officials], in the unflinching discharge of their duties" (citation omitted)). To ensure protection against the side-effects of avoidable litigation, the Supreme Court "recognized an entitlement not to stand trial or face the *other burdens of litigation*, conditioned on the resolution of *the essentially legal question* whether the conduct of which the plaintiff complains violated clearly established law." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis added). In other words, the Supreme Court has instructed lower courts to resolve legal questions—including constitutional questions—when doing so will mitigate the harms of prolonged litigation.

\* \* \*

The dissent nicely describes how constitutional avoidance can effectuate important interests. But neither the federal courts nor Oregon's courts have applied

the doctrine as categorically as the dissent proposes for this case, especially in the First Amendment context. And for good reason: doing so would work irreparable harm to the Constitution itself, rendering the protection of speech in cases like this more theoretical than real. It is the dissent's approach, not the majority's, that would present a novel and unwarranted departure from well-established practice.

## V.

The Supreme Court has explained that, "[p]erhaps because such compulsion so plainly violates the Constitution, most of our free speech cases have involved restrictions on what can be said, rather than laws compelling speech." *Janus*, 138 S. Ct. at 2464. But the First Amendment's protections remain no less robust where, as here, compelled expression is the problem. *See id.* Green seeks to use the power of the state to force Miss United States of America to express a message contrary to what it desires to express. The First Amendment says no. The district court's order granting summary judgment for the Pageant is therefore **AFFIRMED**.

FILED

NOV 2 2022

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

VANDYKE, Circuit Judge, concurring:

## I.

As explained in the majority opinion, the forced inclusion of Anita Green into the Miss United States of America pageant constitutes compelled speech that violates the First Amendment. But the Pageant also argues that the First Amendment independently protects its freedom to associate and affords it the ability to exclude unwanted members. The dissent disagrees, concluding that the OPAA "neither improperly compels speech nor violates the owner's freedom of association." Because it need not, the majority opinion does not reach the association claim. But I write separately to respond to the dissent and explain why the Pageant is protected not only from compelled speech, but also forced association by being required to include Green in its pageantry.

## II.

## A.

The First Amendment's protection of association is a natural outworking of the Amendment's structure. "[W]e have long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609,

1

622 (1984). Without such protection, there would be little preventing "the majority from imposing its views on groups that would rather express other, perhaps unpopular, ideas." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647–48 (2000). And of course, the "[f]reedom of association … plainly presupposes a freedom not to associate." *Jaycees*, 468 U.S. at 623.

To warrant associative protection, a group must: (1) engage in expressive activity; (2) that would be impacted by the forced inclusion of an unwanted individual; and (3) show that the government's interest underlying the law does not outweigh the group's interest in the freedom of expression. *See Dale*, 530 U.S. at 643, 658–59. This framework—by design and in practice—is highly protective of and deferential to associations. Unsurprisingly, the Pageant is entitled to its protection.

**B.**

To merit associative protection, a group must first show that it engages in "expressive association." *Id.* at 648. This standard is not demanding, as the "expressive association" designation extends well beyond "advocacy groups" to include any group that engages "in some form of expression, whether it be public or private." *Id.* As our sister circuit has noted, "[t]he Supreme Court has cast a fairly wide net in its definition of what comprises expressive activity." *Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh*, 229 F.3d 435, 443 (3d Cir. 2000). Our circuit

2

is no different, going as far as to say a group's "distribution of sanctified vegan and vegetarian food" could warrant protection as expressive activity. *See Krishna Lunch of S. Cal., Inc. v. Gordon*, 797 F. App'x 311, 313 (9th Cir. 2020). Given our lenient standard, a pageant consisting of speeches, costumes, and elaborate ceremonies in furtherance of its ideal vision of femininity certainly qualifies.

But the pageantry itself is not the only way in which Miss United States of America engages in expressive activity. The Pageant also seeks to develop and promote female role models. This includes highlighting the volunteerism done by past participants on the Pageant's social media accounts, all of which furthers the Pageant's stated mission of "advocating a platform of community service." This aspect of the Pageant's mission parallels the Boy Scout's desire to "instill values in young people," "both expressly and by example." *Dale*, 530 U.S. at 649, 650. The Supreme Court found that mission sufficiently expressive, so it follows that the Pageant's message should be given the same treatment. And even if there was any doubt about the nature of the Pageant's expression, we are required to "give deference to an association's assertions regarding the nature of its expression." *Id.* at 653. As all the above makes clear, the Pageant sees itself as inherently expressive, so proper deference is warranted.

Green challenges this conclusion by arguing for a different governing framework. Unlike the expansive and deferential test established in *Dale*, Green

points to Justice O'Connor's concurrence in *Jaycees* for guidance. In that concurrence, Justice O'Connor drew a distinction between the First Amendment "rights of commercial association and rights of expressive association." *Jaycees*, 468 U.S. at 634 (O'Connor, J., concurring). Although determining how much commercial activity is needed before an association forfeits this protection cannot "be articulated with simple precision," Justice O'Connor believed that "an association should be characterized as commercial, and therefore subject to rationally related state regulation of its membership and other associational activities, when, and only when, the association's activities are not predominantly of the type protected by the First Amendment." *Id.* at 635. Under this test, Green argues that the Pageant should be characterized as a commercial organization lacking full First Amendment protections.

Green's argument fails for multiple reasons, but the first is simple: a concurrence is not binding on this court. Justice O'Connor concurred precisely because her view was *not* adopted by the Court majority. In fact, Justice O'Connor lamented that the majority "has adopted a test that unadvisedly casts doubt on the power of States to pursue the profoundly important goal of ensuring nondiscriminatory access to commercial opportunities in our society." *Id.* at 632. In other words, the majority's opinion—which *is* binding on this court—is more protective of associational freedoms than the framework Justice O'Connor desired.

4

There is simply no warrant in our constitutional order for a lower court to swap binding Supreme Court precedent for a different rule proposed by a single justice.

Perhaps sensing the boldness of this position, Green attempts to ground the argument by claiming that the Ninth Circuit officially adopted Justice O'Connor's framework in *IDK, Inc. v. Clark County*, 836 F.2d 1185 (9th Cir. 1988). If we had, it would be error for the reasons just explained. But thankfully we didn't. *IDK* centered on numerous escort services' First Amendment challenge to a Nevada county regulation regarding prostitution. *Id.* at 1187–88. In rejecting this claim, our court dismissed the escort services' argument that they were entitled to First Amendment protections as expressive associations. The county contended that the escort services were engaged in "purely commercial activity," while the escort services countered that the sale of their "expression" was akin to newspapers and other protected associations. *Id.* at 1194–95. Given this debate, our court did cite Justice O'Connor's concurrence as one possible standard to adjudicate the claim. *Id.* at 1195. But immediately after citing the concurrence, our court concluded that "[*u*]*nder any test* it is clear that the escort services are primarily commercial enterprises, and their activities are not predominantly of the type protected by the first amendment." *Id.* (emphasis added). Apart from referencing Justice O'Connor's concurrence, the panel in reaching its ultimate conclusion also looked at the text of the First Amendment and identified as "most important" the fact that escort services

5

made "no claim that expression is a significant or necessary component of their activities." *Id.* at 1195–96. Nowhere in the analysis did our court expressly or implicitly adopt Justice O'Connor's framework as binding.

And in any event, the Pageant would *still* be entitled to First Amendment protection as an expressive association even under Justice O'Connor's framework. The crux of Justice O'Connor's position is that a group forfeits First Amendment protection "when, and only when, the association's activities are not predominantly of the type protected by the First Amendment." *Jaycees*, 468 U.S. at 635 (O'Connor, J., concurring). As explained in the majority opinion, Miss United States of America is an expressive association with the "primary purpose" of "produc[ing] pageants." The Pageant certainly has commercial aspects, but they are not independent of the Pageant's ultimate expressive purpose—indeed, they help further that purpose, no less than a for-profit newspaper's charging for subscriptions helps further its fundamentally expressive purpose. Because it is undeniable that pageantry is protected expression under the First Amendment, it follows that the Pageant should be considered an expressive association under Justice O'Connor's framework.

This stands in stark contrast to the organization at issue in *Jaycees*. In Justice O'Connor's words, the "Jaycees—otherwise known as the Junior Chamber of Commerce—is, first and foremost, an organization that, at both the national and local levels, promotes and practices the art of solicitation and management." *Id.* at

6

639. Unlike the Pageant, the "Jaycees itself refers to its members as customers and membership as a product it is selling. More than 80 percent of the national officers' time is dedicated to recruitment, and more than half of the available achievement awards are in part conditioned on achievement in recruitment." *Id.* It is not hard to see why the Jaycees and the Pageant would be classified differently under Justice O'Connor's framework.

## C.

Because the Pageant is an expressive association, the next step is to determine whether the forced inclusion of an unwanted member would impact the organization's ability to express its desired viewpoints. *See Dale*, 530 U.S. at 653. "As we give deference to an association's assertions regarding the nature of its expression, we must also give deference to an association's view of what would impair its expression." *Id.*

Miss United States of America maintains that the forced inclusion of a male would impair its ability to express its views regarding womanhood, and for good reason. The Pageant's goal is "empowering biological women" through its platform and pageantry. Green is not a biological woman—and as explained in the majority opinion, is a vocal advocate for a conflicting viewpoint. Green self-identifies as "a trans woman" and "activist" who wants to "fight for the LGBTIQ community by bringing attention to the issues we face." Green's inclusion would therefore actively

7

advance a message the Pageant opposes. And the forced inclusion of Green would be especially harmful to the Pageant because, as Green explained with other pageants, "I was given the opportunity to have my voice heard on a scale much larger than I could have ever anticipated." The tensions between these two messages are obvious, as is the fact that the forced inclusion of Green would impact the Pageant's ability to express its desired views.

Again, all of this is confirmed by *Dale*. While the Boy Scouts "desire[d] to not 'promote homosexual conduct as a legitimate form of behavior,'" *id.*, Dale

> by his own admission, is one of a group of gay Scouts who have "become leaders in their community and are open and honest about their sexual orientation." … Dale was the copresident of a gay and lesbian organization at college and remains a gay rights activist. Dale's presence in the Boy Scouts would, at the very least, force the organization to send a message, both to the youth members and the world, that the Boy Scouts accepts homosexual conduct as a legitimate form of behavior.

*Id.*

Relying in part on *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557 (1995), the Supreme Court concluded that the forced inclusion of Dale would impermissibly alter the Boy Scouts' message, explaining that just

> [a]s the presence of GLIB in Boston's St. Patrick's Day parade would have interfered with the parade organizers' choice not to propound a particular point of view, the presence of Dale as an assistant scoutmaster would just as surely interfere with the Boy Scouts' choice not to propound a point of view contrary to its beliefs.

8

*Dale*, 530 U.S. at 654.  The case before us is not meaningfully distinguishable.

Importantly, this impact on the Pageant's viewpoint is clear without requiring the Pageant to explain in depth the nature and extent of its opposition to Green's views.  In *Hurley*, the Court surmised that "[t]he parade's organizers may not believe these facts about Irish sexuality to be so, or they may object to unqualified social acceptance of gays and lesbians or have some other reason for wishing to keep GLIB's message out of the parade."  515 U.S. at 574–75; *see also Dale*, 530 U.S. at 654.  Miss United States of America may disagree with the ontological or teleological assumptions underpinning transgenderism,[1] worry over the physical and

---

[1] *See, e.g.*, Ryan T. Anderson, *Anthropological Fallacies*, Public Discourse (June 16, 2022), https://www.thepublicdiscourse.com/2022/06/82881/ (critiquing body-self dualism and expressive individualism by noting that "[m]odern man, however, seeks to be 'true to himself.'  Rather than conform thoughts, feelings, and actions to objective reality (including the body), man's inner life itself becomes the source of truth.  The modern self … seeks to give expression to our individual inner lives, rather than seeing ourselves as embodied beings, embedded in communities and bound by natural and supernatural laws.  Authenticity to inner feelings, rather than adherence to transcendent truths, becomes the norm."); Robert P. George, *Gnostic Liberalism*, First Things (Dec. 2016), https://www.firstthings.com/article/2016/12/gnostic-liberalism ("If we are body-mind (or body-soul) composites and not minds (or souls) inhabiting material bodies, then respect for the person demands respect for the body, which rules out mutilation and other direct attacks on human health. … Sex is constituted by our basic biological organization with respect to reproductive functioning; it is an inherent part of what and who we are.  Changing sexes is a metaphysical impossibility because it is a biological impossibility.").

9

psychological ramifications for "gender-affirming" medical courses of action,[2] or believe that the inclusion of men who identify as women in feminine spaces will undermine the hard-earned progress made by women in society.[3]  But here, as in *Hurley* and *Dale*, it is enough to note the obvious conflict and defer to the Pageant's assertion that Green's forced inclusion would alter its desired message.

**D.**

Given that the Pageant is both an expressive association and that inclusion of Green would impact the Pageant's ability to express its viewpoints, the law can survive only upon passing heightened scrutiny.  *See Dale*, 530 U.S. at 657–59.  As

---

[2] *See, e.g.*, Paul McHugh, *Transgender Surgery Isn't the Solution*, Wall St. J. (May 13, 2016), https://www.wsj.com/articles/paul-mchugh-transgender-surgery-isnt-the-solution-1402615120; Leor Sapir, *A Cause, Not a Cure*, City Journal (May 10, 2022) https://www.city-journal.org/new-study-casts-doubt-on-gender-affirming-therapy (noting that a new study on the efficacy of "gender affirming" therapy "provides further evidence that 'gender-affirming' therapy creates or prolongs the very problem it purports to solve"); Abigail Shrier, *Irreversible Damage: The Transgender Craze Seducing our Daughters* (2020).

[3] *See, e.g.*, Brief for Women's Liberation Front Supporting Defendant at 17 ("Green believes that femaleness is defined by femininity, which is a socially constructed role that by design keeps women in a subordinate, subservient position.  That is what Green believes about women's natural state.  Feminists have been fighting against this toxic system for generations."); Pat Ralph, *Penn swimmer Lia Thomas sets six records at Ivy League Championships*, Phillyvoice (Feb. 21, 2022) https://www.phillyvoice.com/lia-thomas-penn-transgender-swimmer-ivy-league-championships/ (noting that Lia Thomas (a male who now identifies as a woman after three years of competing as a male), "had a banner performance at the Ivy League Women's Swimming & Diving Championships last weekend, winning three individual events and breaking six records.").

explained in *Dale*, the court must balance "the associational interest in freedom of expression … on one side of the scale, and the State's interest on the other." *Id.* at 658–59. Although attempts to weigh such grandiose concepts might otherwise appear daunting, the Supreme Court has offered clear lines of demarcation in this context. The caselaw has established that the general anti-discrimination interests behind a state's public accommodation laws are insufficient to justify a substantial intrusion on an organization's First Amendment rights. In *Dale*, the Supreme Court concluded that

> [t]he state interests embodied in New Jersey's public accommodations law do not justify such a severe intrusion on the Boy Scouts' rights to freedom of expressive association. That being the case, we hold that the First Amendment prohibits the State from imposing such a requirement through the application of its public accommodations law.

*Id.* at 659. The Court conducted the same balancing of interests in *Hurley* and reached a similar result. *Id.* ("[T]he analysis we applied [in *Hurley*] is similar to the analysis we apply here."). There, the Court, again balancing the First Amendment interests of the association against the state's interest manifested in the public accommodations law, sided with the association. It explained that:

> When the law is applied to expressive activity in the way it was done here, its apparent object is simply to require speakers to modify the content of their expression to whatever extent beneficiaries of the law choose to alter it with messages of their own. But in the absence of some further, legitimate end, this object is merely to allow exactly what the general rule of speaker's autonomy forbids.

*Hurley*, 515 U.S. at 578.

11

Of course, ruling for the association under this test is not always guaranteed. In *Jaycees*, the Supreme Court held that the Jaycees, a male-only club centered around providing young men "with opportunity for personal development and achievement" was not sufficiently burdened by the inclusion of women to warrant First Amendment protection. 468 U.S. at 612–13. As the Court explained, "the Jaycees has failed to demonstrate that the Act imposes any serious burdens on the male members' freedom of expressive association." *Id.* at 626. This was in part because the forced inclusion of women "requires no change in the Jaycees' creed of promoting the interests of young men." *Id.* at 627. Also important was the fact that "the Jaycees already invites women to share the group's views and philosophy and to participate in much of its training and community activities." *Id.*

Given these three data-points, there is little doubt that Miss United States of America falls far closer to *Dale* and *Hurley* than *Jaycees*. The Pageant expresses its message through its contestants—both by those who compete and those who ultimately succeed. *See Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 680 (2010) ("*who* speaks on its behalf … colors *what* concept is conveyed"). And the Pageant has actively and consistently enforced its eligibility requirements precisely over a concern about protecting its message. The forced inclusion of a male would therefore directly

12

impact the Pageant's message in a way fundamentally at odds with the Pageant's views on womanhood.

### III.

Speech and association claims often run together. This is because "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association, as this Court has more than once recognized by remarking upon the close nexus between the freedoms of speech and assembly." *NAACP v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 460 (1958). Given this reality, it should not be a surprise to anyone that the Pageant's association claim, like its free speech claim, is meritorious.



Green v. Miss United States of America, No. 21-35228

GRABER, Circuit Judge, dissenting:

The majority opinion marks a radical departure from the well-settled principle that we should consider non-constitutional grounds for decision before reaching constitutional issues—the doctrine of constitutional avoidance.[1] After Defendant Miss United States of America, LLC, denied Plaintiff Anita Green's request to compete in an Oregon pageant on the ground that she is a transgender woman, Plaintiff brought a single state-law claim under the Oregon Public Accommodations Act ("OPAA"), invoking diversity jurisdiction. It is not clear on the present record whether the OPAA even applies to Defendant. Without allowing discovery or briefing on that question, and without making any relevant findings, the district court assumed that the statute applies, held that the First Amendment precludes its application, and entered judgment for Defendant. In doing so, the court doubly erred. If the OPAA applies, Plaintiff must prevail. If the OPAA does not apply, Defendant must prevail, but the constitutional argument passes out of the picture. Unfortunately, the majority opinion repeats the same

---

[1] In using the phrase "constitutional avoidance," throughout this dissent I refer to the principle that federal courts should not decide constitutional questions unnecessarily, as described in Ashwander v. Tennessee Valley Authority, 297 U.S. 298. 346–48 (1936) (Brandeis, J., concurring). I do not refer to the interpretive tool, the canon of constitutional avoidance, derived from that broader principle.

mistakes.  I therefore respectfully but emphatically dissent.

A.  <u>Under Settled Principles of Federal Law, We Should Refrain from Deciding the Constitutional Issue Now</u>.

Precedents of the Supreme Court and this court dictate that we should not rule on the constitutionality of the OPAA until it is established that the OPAA actually applies to Defendant.  The Supreme Court has not minced words:  "If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable."  <u>Spector Motor Service, Inc. v. McLaughlin</u>, 323 U.S. 101, 105 (1944).  Sitting en banc, we have summarized in equally sweeping terms:  "Prior to reaching any constitutional questions, federal courts must consider nonconstitutional grounds for decision.  This is a fundamental rule of judicial restraint."  <u>United States v. Kaluna</u>, 192 F.3d 1188, 1197 (9th Cir. 1999) (en banc) (quoting <u>Jean v. Nelson</u>, 472 U.S. 846, 854 (1985)) (internal quotation marks omitted).  We recently reaffirmed that principle specifically with respect to an alternative state-law ground:  "It is well-established that [we] should avoid adjudication of federal constitutional claims when alternative state grounds are available."  <u>Potter v. City of Lacey</u>, 46 F.4th 787, 791 (9th Cir. 2022) (brackets in original) (quoting <u>Cuviello v. City of Vallejo</u>, 944 F.3d 816, 826 (9th Cir. 2019)) (internal quotation marks omitted); <u>accord</u> <u>Hewitt v.</u>

2

Joyner, 940 F.2d 1561, 1565 (9th Cir. 1991).  Despite that settled rule, the majority

opinion skips over an essential step in the analysis when it holds that, if the OPAA

applied to Defendant, the statute would violate Defendant's First Amendment

rights.

This error is especially critical because Defendant raises only an as-applied

challenge.  If the statute does not apply, then an opinion as to the constitutionality

of the statute's hypothetical application to Defendant is advisory.  See Poe v.

Ullman, 367 U.S. 497, 503 (1961) ("This court can have no right to pronounce an

abstract opinion upon the constitutionality of a State law." (citation and internal

quotation marks omitted)); MacNeil v. Marks (In re MacNeil), 907 F.2d 903, 904

(9th Cir. 1990) (per curiam) (describing an advisory opinion as one "advising what

the law would be upon a hypothetical state of facts" (citation and internal quotation

marks omitted)).

The majority opinion's insistence on reaching an unnecessary constitutional

issue breaks from a long tradition of constitutional avoidance in the federal courts.

In Washington State Grange v. Washington State Republican Party, 552 U.S. 442,

450–51 (2008), Justice Thomas, writing for the Court, discussed the benefits of

deciding as-applied, as opposed to facial, challenges to statutes.  As-applied

challenges avoid subverting "the fundamental principle of judicial restraint that

3

courts should neither 'anticipate a question of constitutional law in advance of the necessity of deciding it' nor 'formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.'"  Id. (quoting Ashwander v. Tenn. Valley Auth., 297 U.S. 288, 346–47 (1936) (Brandeis, J., concurring)). Justice Thomas drew from Justice Brandeis's concurrence in Ashwander, which laid out "a series of rules under which [the Court] has avoided passing upon a large part of all the constitutional questions pressed upon it for decision."  Ashwander, 297 U.S. at 346 (Brandeis, J., concurring).  Both rules cited by Justice Thomas—a rule against anticipating a constitutional question when not necessary and a rule against formulating constitutional rules that go beyond the precise facts involved in the application of the relevant statute—suggest that we should not decide whether a state statute is unconstitutional <u>as applied</u> unless it first has been determined that the state statute in question <u>actually applies</u> to the defendant.[2]

---

[2] Contrary to the majority opinion's assertion, applying this standard principle would not prevent courts from deciding "any" constitutional question pre-trial. Maj. Op. at 42.  Facial constitutional challenges would not be affected in any way, nor would as-applied constitutional challenges in which it is clear that the allegedly offending statute actually applies.  Because Defendant challenges the OPAA only as applied to it in the circumstances here, precedents involving <u>facial</u> constitutional challenges—including <u>Village of Schaumburg v. Citizens for a Better Environment</u>, 444 U.S. 620 (1980)—are readily distinguishable.  Cases applying the overbreadth doctrine, such as <u>Members of the City Council v. Taxpayers for Vincent</u>, 466 U.S. 789, 796 (1984) and <u>Broadrick v. Oklahoma</u>, 413 U.S. 601, 612 (1973), analyze whether a statute is constitutional on its face and are similarly

(continued)

4

Justice Brandeis laid out two other rules in Ashwander that are implicated by this case. First, "[t]he Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of." Id. at 347. "Thus, if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter." Id. Second, "[t]he Court will not pass upon the validity of a statute upon complaint of one who fails to show that he is injured by its operation." Id.

Ashwander has long been a lodestar in our jurisprudential constellation. See, e.g., Bond v. United States, 572 U.S. 844, 855 (2014) (Roberts, C.J.) ("[I]t is a 'well-established principle governing the prudent exercise of this Court's jurisdiction that normally the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case.'" (quoting Escambia County v. McMillan, 466 U.S. 48, 51 (1984) (per curiam) and citing Ashwander, 297 U.S. at 347)); Slack v. McDaniel, 529 U.S. 473, 485 (2000) (Kennedy, J.) (stating that "[t]he Ashwander rule should inform the court's discretion" to decide the case on non-constitutional grounds); Dep't of Com. v. U.S. House of Representatives, 525 U.S. 316, 344 (1999) (O'Connor, J.) ("[W]e find it

---

inapposite. In an as-applied challenge, the claim generally is ripe for decision only if, in fact, the statute in question applies.

5

unnecessary to reach the constitutional question presented." (citing <u>Ashwander</u>, 297 U.S. at 347)); <u>Jean v. Nelson</u>, 472 U.S. 846, 854 (1985) (Rehnquist, J.) (citing <u>Ashwander</u> to support avoiding the constitutional issue); <u>Massachusetts v. Westcott</u>, 431 U.S. 322, 323 (1977) (per curiam) ("In accordance with our longstanding principle of deciding constitutional questions only when necessary, . . . we decline to decide the privileges and immunities question presented in this case, and vacate the judgment and remand the case for further consideration . . . ." (citing <u>Ashwander</u>, 297 U.S. at 347)).  Three Supreme Court cases on this topic are worth examining in more detail.

In <u>Spector</u>, 323 U.S. 101, the Court confronted a challenge to Connecticut's corporate tax statute.  An out-of-state corporation sought an injunction in federal court to bar enforcement of the statute against it.  <u>Id.</u> at 102.  The plaintiff argued that the statute did not apply to the corporation but that, if it did, then that application of the statute violated the Commerce and Due Process clauses of the federal Constitution.  <u>Id.</u>  The district court held that the state statute did not apply to the plaintiff.  <u>Id.</u>  The Second Circuit disagreed and reached the constitutional issues.  <u>Id.</u> at 102–03.

But the Supreme Court vacated and remanded so that Connecticut courts could determine whether the statute applied to the plaintiff in the first place.  <u>Id.</u> at 106.  The Court explained its decision as one of avoidance:

6

> If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable. And so, as questions of federal constitutional power have become more and more intertwined with preliminary doubts about local law, we have insisted that federal courts do not decide questions of constitutionality on the basis of preliminary guesses regarding local law.

Id. at 105 (collecting cases). Although Spector was decided more than 70 years ago, it is still good law. See Matal v. Tam, 137 S. Ct. 1744, 1755 (2017) (noting that the Court has frequently stressed that "we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable." (quoting Spector, 323 U.S. at 105) (internal quotation marks omitted)); Dep't of Com., 525 U.S. at 343 (citing Spector to support not reaching the constitutional question presented); Kaluna, 192 F.3d at 1197 (same).

In the second case, Escambia County v. McMillan, 466 U.S. 48 (1984) (per curiam), Black voters challenged a county's at-large election system for commissioners. Id. at 49. The district court ruled that the voting system violated the Fourteenth and Fifteenth Amendments, as well as the Voting Rights Act. Id. The Fifth Circuit affirmed the district court, but only on the Fourteenth Amendment theory—it declined to reach the two other grounds for the ruling. Id. at 50. The Supreme Court vacated the judgment of the Fifth Circuit because the constitutional questions would be moot if the plaintiffs succeeded on their statutory claim. See id. at 51 ("It is a well established principle governing the prudent

7

exercise of this Court's jurisdiction that normally the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case."). The Court then remanded the question to the Fifth Circuit for further briefing on the statutory question. Id. at 51–52.

Third, in United States v. Locke, 471 U.S. 84 (1985), a district court had declared unconstitutional a statute that resulted in forfeiture of unpatented mining claims if the holders of the claims did not meet annual filing requirements. Id. at 91. Reviewing the district court's decision directly, the Court determined that the district court had erred by ignoring nonconstitutional questions that could have resolved the case. The Court laid out two possible ways to proceed:

> When the nonconstitutional questions have not been passed on by the lower court, we may vacate the decision below and remand with instructions that those questions be decided, . . . or we may choose to decide those questions ourselves without benefit of lower court analysis . . . . The choice between these options depends on the extent to which lower court factfinding and analysis of the nonconstitutional questions will be necessary or useful to our disposition of those questions.

Id. at 92 n.9 (internal citations omitted). As described above, this case presents the first situation, because fact-finding and analysis by the district court are necessary to the disposition of the questions presented here.

The list of cases urging avoidance when we confront both a statutory question and a constitutional question is long. See, e.g., Heald v. District of Columbia, 259 U.S. 114, 123 (1922) ("It has been repeatedly held that one who

8

would strike down a state statute as violative of the federal Constitution must show that he is within the class of persons with respect to whom the act is unconstitutional and that the alleged unconstitutional feature injures him."); <u>Ala. State Fed'n of Lab., Loc. Union No. 103 v. McAdory</u>, 325 U.S. 450, 462 (1945) ("All these considerations forbid our deciding here the constitutionality of a state statute of doubtful construction in advance of its application and construction by the state courts and without reference to some precise set of facts to which it is to be applied."); <u>Parker v. Los Angeles County</u>, 338 U.S. 327, 333 (1949) ("The best teaching of this Court's experience admonishes us not to entertain constitutional questions in advance of the strictest necessity."); <u>Standard Oil Co. of California v. Arizona</u>, 738 F.2d 1021, 1023 (9th Cir. 1984) ("[W]e must, if at all possible, resolve cases on statutory grounds before reaching constitutional questions."); <u>Fox Television Stations, Inc v. Aereokiller, LLC</u>, 851 F.3d 1002, 1013 (9th Cir. 2017) ("We . . . adhere to the well established principle . . . [that] the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case" (brackets and second ellipsis in original) (citation and internal quotation marks omitted)).[3]

---

[3] The majority opinion's reference to an analytical framework that some courts, including ours, previously applied in Second Amendment cases misses the mark entirely. <u>See</u> Maj. Op. at 45 (citing <u>Duncan v. Bonta</u>, 19 F.4th 1087 (9th Cir. 2021) (en banc), <u>cert. granted, judgment vacated</u>, 142 S. Ct. 2895 (2022), and

(continued)

9

It is true that courts do not always choose to follow the path of constitutional avoidance. See, e.g., Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc., 6 F.4th 1247, 1256 n.12 (11th Cir. 2021) (declining to decide whether websites are places of public accommodation under Title II of the Civil Rights Act, 42 U.S.C. § 2000a et seq., because plaintiff's claim "fail[ed] regardless on First Amendment grounds"). But those occasional choices do not counsel in favor of exercising our discretion in that way here.

Indeed, the majority opinion demonstrates why, in this case, a departure from our long tradition of judicial restraint is a particularly imprudent choice. The majority opinion justifies its application of strict scrutiny to the OPAA by assuming that the statute applies to Defendant. Maj. Op. at 32–33. It then states that the law must be narrowly tailored to serve compelling state interests to survive such scrutiny. Id. at 33. But "tailoring" is a meaningless concept if it is not tied to the scope of the statute. And the state's interests are inherently bound up in which

---

vacated and remanded, No. 19-55376, 2022 WL 4393577 (9th Cir. Sep. 23, 2022)). In Duncan, plaintiffs brought a facial challenge to California's ban on large-capacity magazines. Id. at 1101. We "assum[ed] without deciding" that the first step of a two-step constitutional inquiry was met, id. at 1103, which asked "whether the challenged law affects conduct that the Second Amendment protects," id. at 1102. Assuming that one step within a multi-step constitutional inquiry is met does not speak—at all—to the completely separate question whether a court should reach a constitutional issue before deciding a statutory one. Even if Duncan's analysis could inform how to approach a facial challenge to the OPAA, that is not what this case is.

individuals and organizations are actually regulated by the statute.

It is worth underscoring that resolving the statutory question first is not just a theoretical exercise—it truly is not clear whether the OPAA applies to Defendant. Under Oregon law, an organization is a public accommodation if it is a commercial enterprise with membership policies that "are so unselective that the organization can fairly be said to offer its services to the public." Lahmann v. Grand Aerie of Fraternal Ord. of Eagles (Lahmann I), 43 P.3d 1130, 1137 (Or. Ct. App. 2002). The OPAA covers "services offered broadly, even with some significant restrictions," but the statute does not cover "services that are distinctly private in nature and that are not offered even to a defined segment of the public." Abraham v. Corizon Health, Inc., 511 P.3d 1083, 1093 (Or. 2022). A critical inquiry is whether the business offers the service with "the element of selectivity necessary to qualify as distinctly private." Id. at 1094.

A service may be a "public accommodation" within the meaning of the statute even if it is offered to only a segment of the public. See id. at 1094 (holding that, by providing healthcare services to residents of a county jail, the private contractor was offering those services to the public). Thus, one could conclude (for example) that "parents of high school children" or "residents of Jackson County" would be segments of the public, such that entities serving those persons would be public accommodations. But a business cannot escape the reach

11

of the OPAA by asserting that it is serving a subset of the general public protected by the OPAA: for example, "a restaurant cannot argue that it does not provide services to the public because it hangs a 'whites only' sign in the window." Id. at 1090. Under that reasoning, a business that serves only "women" (however defined) would be providing services to the public but would be violating the OPAA.[4]

Defendant has colorable arguments that it does not meet the statutory requirements. As the majority opinion describes Defendant, it rigorously monitors its contestants to determine their eligibility. Maj. Op. at 3–4. Defendant has repeatedly rejected applicants for reasons that have nothing to do with an applicant's belonging to a group protected by the OPAA. See id. (describing applicants who have been rejected for posing nude or otherwise not comporting with Defendant's "vision and message"). Those facts suggest that Defendant is selective about who can compete. It is possible that, if Defendant is sufficiently selective, the OPAA does not apply to it. See Vejo v. Portland Pub. Schs., 204 F. Supp. 3d 1149, 1168 (D. Or. 2016) (concluding that the OPAA did not apply to private college because of its selectivity), rev'd and remanded on other grounds, 737 F. App'x 309 (9th Cir. 2018) (unpublished); Abukhalaf v. Morrison

_____

[4] The majority opinion never engages with the full scope of OPAA coverage, as definitively interpreted by Oregon's appellate courts in Lahmann I and Abraham.

12

<u>Child & Fam. Servs.</u>, No. CV 08-345-HU, 2009 WL 4067274, at *7 (D. Or. Nov. 20, 2009) (concluding that the OPAA did not apply to a recruiter for foster parents because the recruiter retained discretion in the selection of which applicants could be foster parents); <u>cf.</u> <u>Abraham</u>, 511 P.3d at 1094 (holding that the OPAA covers medical services provided by a county jail because it is not "selective in the way that a club or other distinctly private organization is").

The majority opinion's examples—theater, cinema, and the Super Bowl's halftime show, Maj. Op. at 8—all are excellent demonstrations of the probable limits of what organizations are covered by the statute. All three media include both performers and an audience. But the OPAA likely would apply only to the organization hosting the audience, not to the organization hiring the performers. Choosing actors for a production of <u>Hamilton</u>, making a sequel to an 80s cinema classic, and assembling a troupe of Beyonce's backup dancers are intensely selective processes that cannot be said to be open to the public as contemplated by the OPAA. It is highly unlikely that the OPAA would apply to the selection of performers for those roles. On the other hand, the OPAA likely would apply to the venues that sell tickets to the audiences who watch those performances. This paradigm raises the crucial question—is a contestant in one of Defendant's pageants more similar to the performers or to the audience? The answer is by no means clear, and it should be determined by a fact-finder after sufficient discovery

13

and briefing.[5]

In sum, by assuming that the statute applies to Defendant—an assumption that is not definitively supported by the extant record—the majority risks issuing an unconstitutional advisory opinion and flouts a longstanding tradition of judicial restraint in the federal courts.  Applying our ordinary rule of constitutional avoidance, I would vacate the judgment and remand this case to the district court to determine whether the OPAA applies to Defendant before we address any constitutional concerns regarding the application of the statute.

> B.      Principles Applied by the Oregon Courts Strongly Suggest, If Not Require, That We Refrain from Deciding the Constitutional Issue Now.

Oregon Supreme Court cases clearly demonstrate that the principle of constitutional avoidance is equally well entrenched in Oregon law; interpretation of statutes comes first.  See, e.g., State ex rel. Dept. of Transp. v. Alderwoods (Or.), Inc., 366 P.3d 316, 330 (Or. 2015) (en banc) (holding that "generally we will not decide constitutional issues when there is an adequate statutory basis for decision"); Vasquez v. Double Press Mfg., Inc., 437 P.3d 1107, 1110 (Or. 2019) (stating the principle that the court generally avoids reaching constitutional

---

[5] The majority opinion is concerned that, "[h]ad some anti-discrimination statute been applied to Hamilton forcibly to include white actors, the show simply would not be able to express the message it desired."  Maj. Op. at 12 (emphasis added). But Plaintiff did not sue under a hypothetical statute; she sued under the OPAA. Also, as noted in text, the OPAA likely would not apply to the casting of Hamilton.

14

questions unless it is necessary to decide them).  As the Oregon Supreme Court

summarized in State v. Barrett, 255 P.3d 472 (Or. 2011):

> [O]rdinarily, this court's salutary sense of judicial restraint would lead us to avoid reaching constitutional questions in advance of the necessity of deciding them.  As this court has observed:  "The need to face a constitutional issue arises, if at all, only after the court determines what ordinary laws authorize, require or forbid."  Burt v. Blumenauer, 299 Or. 55, 70, 699 P.2d 168 (1985) (citation omitted).

> Applying the logic of that proposition, this court has stated that,

>> "if statutory sources of law provide a complete answer to the legal question that a case presents, we ordinarily decide the case on that basis, rather than turning to constitutional provisions."

> Rico-Villalobos v. Giusto, 339 Or. 197, 205, 118 P.3d 246 (2006).  This court follows that decisional principle even if the parties attempt to force the court to decide a constitutional question by confining their arguments to matters of constitutional law, rather than addressing arguably dispositive aspects of subconstitutional law.

>> "This court decides cases on subconstitutional grounds when it can, even if the parties present only constitutional arguments for the court's consideration.  See, e.g., State v. Conger, 319 Or. 484, 490, 878 P.2d 1089 (1994); Zochert v. Fanning, 310 Or 514, 520, 800 P.2d 773 (1990) (so stating)."

> Li v. State of Oregon, 338 Or. 376, 391, 110 P.3d 91 (2005).

Id. at 477 (emphasis added); see also State ex rel. Engweiler v. Felton, 260 P.3d

448, 463 (Or. 2011) (recognizing that the court's practice in dealing with legal

15

challenges to administrative rules is to "consider statutory questions before turning to constitutional issues").

Oregon courts have recognized one narrow exception to the general rule that statutory questions come first.[6] In Barrett, the Oregon Supreme Court deviated from its standard practice of considering statutory questions first because the Oregon legislature had "created a clear and expedited procedural path for a victim [of stalking] to assert claims for the violation of her constitutional rights." 255 P.3d at 477. The court concluded that, given the Oregon legislature's intent, it was appropriate to address the constitutional claims first where the statutory claims concerned the same conduct and lacked a clear procedural path to a remedy. Id.

No similar legislative intent is present here, and no exception to the rule of constitutional avoidance applies here. To the contrary, the Oregon Supreme Court

---

[6] The majority opinion cites cases in which the Oregon courts have chosen, in some narrow circumstances, to decide federal constitutional questions before addressing state constitutional questions. Maj. Op. at 38–39 (citing Neumann v. Liles, 369 P.3d 1117, 1123 n.6 (Or. 2016); Klein v. Oregon Bureau of Lab. & Indus., 410 P.3d 1051, 1064, 1074 (Or. Ct. App. 2017), cert. granted, judgment vacated, 139 S. Ct. 2713 (2019); Church at 295 S. 18th St., St. Helens v. Emp. Dep't, 28 P.3d 1185, 1190 n.2 (Or. Ct. App. 2001)). But those cases do not in any way suggest that courts may decide constitutional issues before addressing statutory questions. To the contrary, one of the cited cases provides yet another example in support of the proposition that Oregon courts begin by adjudicating statutory questions. See Church at 295 S. 18th St., 28 P.3d at 1187–89 (concluding that the petitioner church fell within the statutory definition of an "employer" before turning to the church's First Amendment defense).

16

has used the statute-first doctrine of constitutional avoidance <u>specifically in the context of the OPAA</u>, declining to decide a First Amendment as-applied challenge. In <u>Schwenk v. Boy Scouts of America</u>, 551 P.2d 465 (Or. 1976), the plaintiff sued the Boy Scouts after they denied membership to her daughter, arguing that the organization's gender-based exclusion violated the OPAA. <u>Id.</u> at 466. Although the plaintiff did not raise any constitutional arguments, the Boy Scouts maintained that interpreting the OPAA in the manner suggested by the plaintiff would violate the Boy Scouts' constitutional right of association. <u>Id.</u> at 466, 469 n.5. The Oregon Supreme Court held that the OPAA did not apply to the Boy Scouts, observing: "Because the decision by the trial court may be properly affirmed on this ground, it is not necessary for this court to consider" the constitutional issues. <u>Id.</u> at 469 n.5.

The Oregon Court of Appeals' decision in <u>Lahmann I</u> also is instructive. The trial court had ruled on summary judgment that the Fraternal Order of Eagles was a place of public accommodation and that it violated the OPAA by excluding female members. <u>Id.</u> at 1131. The Eagles appealed, arguing that the OPAA did not apply but that, if it did, application of the statute to the Eagles violated the constitutional right of association. The Court of Appeals noted that, under Oregon law, a place of public accommodation "is a business or commercial enterprise that

17

offers privileges or advantages to the public." Id. at 1134. Looking at the record, the court concluded that there was a genuine issue of material fact as to whether the Eagles met that definition. Id. at 1138. The court continued:

> The dissent reasons that, if the Public Accommodation Act applies to the Eagles, it violates the right of association protected by the state and federal constitutions. In our view, it would be premature to reach those issues until the historical facts that underlie whether the Public Accommodation Act applies to the Eagles are resolved at trial. Not only would we be reaching a constitutional issue that could potentially be resolved on statutory grounds, but the parties may also develop additional facts on remand that will bear on the constitutional issue if the trier of fact finds that the act applies to the Eagles.

Id. at 1138 (emphasis added). In short, the Oregon court expressly declined to reach the constitutional issue until it was certain that the OPAA applied to the defendant.

This case arises solely under state law. Principles of comity thus strongly support the conclusion that, just as the Oregon courts would, we should first decide whether the statute applies.

Moreover, in my view, a proper application of Erie R. Co. v. Tompkins, 304 U.S. 64 (1938), requires us to follow Oregon canons of construction, including but not limited to the canon of constitutional avoidance, when determining the meaning and applicability of an Oregon statute. For purposes of the Erie doctrine, these are issues of substantive law: what is a public accommodation, does

18

Defendant meet the definition, and how does Oregon precedent require a court to go about answering those questions?

"It is important to the fair administration of law that 'the outcome of the litigation in the federal court should be substantially the same, so far as legal rules determine the outcome of a litigation, as it would be if tried in a State court.'" Cooper v. Tokyo Elec. Power Co. Holdings, Inc., 960 F.3d 549, 557–58 (9th Cir. 2020) (quoting Gasperini v. Ctr. For Humanities, Inc., 518 U.S. 415, 428 (1996)). To that end, "[t]he Erie doctrine would seem to require federal courts to interpret a state's law just as would the courts of that state in order to ensure consistent outcomes in federal and state courts." 1256 Hertel Ave. Assocs., LLC v. Calloway, 761 F.3d 252, 260 n.5 (2d Cir. 2014) (citing Abbe R. Gluck, Intersystemic Statutory Interpretation: Methodology as "Law" and the *Erie* Doctrine, 120 Yale L.J. 1898 (2011)). Professor Gluck argues that, in the absence of a conflicting federal constitutional principle, "federal courts should apply state rules of statutory interpretation to state law questions." Gluck, supra, at 1906–07, 1959 & 1959 n.212 (explaining that federal courts, to our detriment, have all too frequently ignored this issue); see also Sonner v. Premier Nutrition Corp., 971 F.3d 834, 839–40 (9th Cir. 2020) (stating that the outcome of a diversity action in federal court should be substantially the same as if tried in state court and that we should consider the policies underpinning relevant state laws); County of Orange

19

v. U.S. Dist. Ct. (In re Cnty. of Orange), 784 F.3d 520, 531 (9th Cir. 2015) ("Erie ensures that 'a federal court adjudicating a state-created right solely because of the diversity of citizenship of the parties is for that purpose, in effect, only another court of the State . . . .'") (quoting Guar. Tr. Co. of N.Y. v. York, 326 U.S. 99, 108 (1945)); Thomas v. Reeves, 961 F.3d 800, 820 (5th Cir. 2020) (en banc) (Willett, J., concurring) (referring to a different branch of the doctrine of constitutional avoidance as a "substantive" canon of construction); Metroil, Inc. v. ExxonMobil Oil Corp., 672 F.3d 1108, 1113 n.2 (D.C. Cir. 2012) (Kavanaugh, J.) (citing with approval Gluck's article and noting that a state's retroactivity principles govern a federal court's analysis of state laws).

The foregoing rules apply here as follows. This case is in federal court on a single state-law claim and the court is sitting in diversity, so we must apply the state's law to substantive questions. The guiding principle of Erie is that the federal court must reach substantially the same result as a state court would reach if considering the same claim. In this context, "substantially the same" result, Gasperini, 518 U.S. at 428, does not mean only the tag line—that is, which party wins; the concept also encompasses the nature of the holding.

Take the example of two defendants that operate similar pageants in Oregon. The first is sued in state court and the second is sued in federal court because of diversity jurisdiction. Under Oregon's established precedents, the state court

would determine first whether the OPAA applies. It could decide that the OPAA does not apply to that defendant's activity and dismiss the action. If the federal court assumed that the OPAA applies, as the majority opinion does here, it could conclude that the particular activity at issue is protected by the First Amendment and thus that the OPAA cannot be applied to the defendant in federal court. It would then dismiss the action. In both examples, the suit is dismissed. But the state-court defendant now knows that its activity is not subject to regulation under the OPAA. The federal defendant knows only that it can engage in whatever limited First Amendment activity formed the basis of the complaint. The federal defendant has less certainty moving forward about how the OPAA may apply to it. This is a very different result for the parties involved in the two lawsuits. It also is a different result for the State of Oregon, which has a strong interest in knowing what activities are covered by its public accommodations law. It is for this reason, among others, that Oregon courts examine the meaning and application of the OPAA <u>first</u>, reaching as-applied constitutional claims <u>only</u> if it is established that the statute in fact applies. This method of decision allows the state to determine the bounds of its statutes on their own terms before considering how they are

21

affected by the federal Constitution.  We are obliged to do the same.[7]

Moreover, there may be a different result in the ordinary sense, too. Depending on what discovery reveals, if the OPAA does not apply, then Plaintiff loses this case.  As explained in Part C below, if the OPAA does apply, then Plaintiff prevails in this action.

Under the Erie doctrine, not only should we avoid the constitutional questions, but we likely are required to.  We must vacate the judgment and remand this case to the district court, because that is what an Oregon court would do with respect to this state-law statutory claim.

C.      If We Reach the As-Applied First Amendment Defense, Plaintiff Should Prevail on the Present Record.

Finally, I express briefly my view that, if we are to reach Defendant's First Amendment defenses, Plaintiff should prevail on the current record.  In analyzing these issues, we must assume that Defendant is a business that offers services to the public, as defined by the OPAA, because otherwise the OPAA would not apply

_____

[7] Defendant argues, and the majority opinion agrees, that we cannot avoid deciding the First Amendment issue because it filed an anti-SLAPP motion.  Maj. Op. at 55–56.  That assertion is incorrect.  The core question in an anti-SLAPP motion is whether "there is a probability that the plaintiff will prevail on the claim."  Or. Rev. Stat. 31.150(1).  As noted, Plaintiff brings only one claim, under the OPAA. Determining whether there is a probability that Plaintiff will prevail on that claim raises the same predicate issue:  does the OPAA apply to Defendant in the first place?  If the statutory answer is "no," then Defendant prevails.  Only if the statutory answer is "yes" is there a reason to assess the strength of Defendant's as-applied constitutional defense.

22

to it.[8]  Abraham, 511 P.3d at 1090.  A law that compels such a business to provide its services to a customer despite that business owner's prejudices neither improperly compels speech nor violates the owner's freedom of association.[9]

On the incomplete record before us Defendant is, first and foremost, a for-profit corporation acting in a marketplace.  It is registered as a business that conducts general retail sales and promotes pageants.  To do so, it has developed a multi-layered revenue stream.  State directors that wish to host pageants must pay Defendant $2500 plus $1000 for additional divisions.  The state directors then recruit contestants and, in some instances, receive commissions for successful recruitments.  Once contestants are recruited by state directors, the contestants each pay a $595 entry fee to Defendant.  Contestants then must purchase a $299

---

[8] The majority opinion improperly conflates this assumption—which we should not be making, and which I make only because the majority opinion does so, and only in the context of this alternative analysis—with a firm conclusion that the OPAA applies.  Maj. Op. at 48 n.23.

[9] References to cases dealing with the Free Exercise Clause, Maj. Op. at 22–23, have no bearing on the appropriate analysis.  In Kennedy v. Bremerton School District, 142 S. Ct. 2407 (2022), the plaintiff argued violations of "both the Free Exercise and Free Speech clauses of the First Amendment."  Id. at 2421.  The Court determined that the outcome in Kennedy did not depend on "[w]hether one views the case through the lens of the Free Exercise or Free Speech Clause."  Id. at 2426.  But the fact that the result in Kennedy happened to be the same under either clause does not support the majority opinion's contention that "the reasoning of Free Exercise caselaw is directly applicable to the concern raised in this case[.]"  Maj. Op. at 23 n.14.  Here, Defendant relies only on theories regarding freedom of speech and freedom of association.

23

advertisement in Defendant's program book—either through sponsorship or through the use of their own funds. In addition, contestants may sell more advertisements for the program book, for which they receive a commission ranging from 20% to 50%, with the remaining proceeds going to Defendant. Contestants also are encouraged to recruit additional contestants, for which they receive a $50 commission per recruit (after the new recruit has paid the entry fee and the advertisement fee). Contestants submit headshots, for which they are required to pay hair, makeup, and photography vendors that financially support Defendant through sponsorships. Defendant also raises funds through ticket sales to the pageant itself, the costs of which are covered by the entry or advertising fees paid by contestants.[10] Defendant engaged in a concerted effort to recruit state directors and have those directors recruit contestants, which further increased Defendant's profits. In sum, the record before us suggests that Defendant's for-profit business model has more in common with a multi-level marketing business than with the

_____

[10] Defendant notes in its FAQs for contestants:

> [Q:] Do I get a free ticket for my parent or husband?
> [A:] NO! Everyone must purchase a ticket to attend the pageant.
> . . .
> [Q:] Do children under 5 need a ticket?
> [A:] YES! Everyone needs a ticket.

24

parade in <u>Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston</u>, 515

U.S. 557 (1995), and demonstrates that Defendant is a commercial association.[11]

As a commercial entity that offers its services "to the public," as defined by

the OPAA, Defendant must provide its services to customers with protected

statuses even if it would prefer not to do so. That is all that the OPAA requires. It

does not compel speech and it does not violate Defendant's right to associate

freely. <u>See</u> <u>Hurley</u>, 515 U.S. at 572 ("Provisions like [public accommodations

laws] are well within the State's usual power to enact when a legislature has reason

to believe that a given group is the target of discrimination, and they do not, as a

general matter, violate the First or Fourteenth Amendments."); <u>Roberts v. U.S.</u>

<u>Jaycees</u>, 468 U.S. 609, 634 (1984) (O'Connor, J., concurring) ("The Constitution

does not guarantee a right to choose employees, customers, suppliers, or those with

whom one engages in simple commercial transactions without restraint from the

State. A shopkeeper has no constitutional right to deal with persons of one sex.");

<u>Heart of Atlanta Motel, Inc. v. United States</u>, 379 U.S. 241, 259–60 (1964) (noting

---

[11] Also weighing against a finding that Defendant is an expressive association is that, as written, the pageant's "natural born female" eligibility requirement does not match the ostensible message of the "Miss United States of America" pageant. Under the pageant's policy, a transgender man, assigned female gender at birth, is eligible to compete. But that fact is inconsistent with Defendant's statement at oral argument that the "point of the pageant's message is to celebrate what the pageant sees as the ideal womanhood or femininity."

that there is "nothing novel" about public accommodations laws and that the Supreme Court has repeatedly upheld such laws).

Defendant cannot alter the nature of the business transaction by claiming that it has a discriminatory belief that it hopes to further through its business. See Norwood v. Harrison, 413 U.S. 455, 470 (1973) ("Invidious private discrimination may be characterized as a form of exercising freedom of association protected by the First Amendment, but it has never been accorded affirmative constitutional protections."). A white supremacist who operates a bowling alley cannot transform his business into an expressive entity by naming the building "White Bowling," claiming that he intends to use the bowling alley to express his racist beliefs, and then turning away Black bowlers who hope to compete in a bowling league. Cf. Abraham, 511 P.3d at 1090 (holding that "a restaurant cannot argue that it does not provide services to the public because it hangs a 'whites only' sign in the window"). Nor can a militant feminist owner of a hotel chain, "A Room of One's Own," refuse to allow men to stay at her hotels and claim that her organization should receive heightened First Amendment protections because she hopes to further her beliefs with her business.[12]

---

[12] In Hurley, 515. U.S. at 572, the Supreme Court noted that the parade's organizers explicitly disclaimed any intent to exclude openly homosexual individuals from participating in the parade merely on account of their status as openly homosexual. Instead, the organizers sought to exclude one particular group

(continued)

26

Commercial entities, of course, are not devoid of speech rights, and they have successfully challenged government regulations as compelled speech. E.g., Am. Beverage Ass'n v. City & County of San Francisco, 916 F.3d 749, 755 (9th Cir. 2019) (en banc). The State of Oregon, for example, likely could not compel the owner of the hotel chain to decorate her lobbies with banners proclaiming that "June is National Men's Health Month!" or mandate that the white supremacist place "Black Lives Matter" signs in his bowling alley. But a state's requiring a commercial entity that offers services to the general public or to a segment of the general public to do so in a way that does not discriminate against individuals who have a particular status does not compel that business to speak. Nor does such a requirement force that business to associate in a way that undermines its freedom of association.

The state has a compelling interest in preventing discrimination on the part of commercial entities that offer their services to the public. Any burden faced by such public accommodation's being required to offer services without discriminating is minimal, and the non-discrimination policy neither compels speech nor violates the freedom of association.

---

with a particular message that the organizers believed conflicted with their views. Although Plaintiff may be a transgender activist, there is no evidence in the record that Defendant refused to provide its services to her because of her activism. There is evidence only that it refused to provide her its services because of her status as a transgender person. Maj. Op. at 4–5.

A corollary to the substantive requirements of a non-discrimination statute like the OPAA is the obligation to remove an explicit criterion that violates the law.  For example, before the enactment of modern civil rights laws, newspapers commonly segregated ads by "Help Wanted - Male" and "Help Wanted - Female." Employers inquired about applicants' religion or had express policies relegating non-white employees to a separate, lower-paying work unit.  See, e.g., Griggs v. Duke Power Co., 401 U.S. 424, 426–27 (1970).  Such ads, questions on applications, and policies no longer are allowed.  That limitation does not compel speech, but it is a content-based restriction on speech.  See Recycle for Change v. City of Oakland, 856 F.3d 666, 670 (9th Cir. 2017) (noting that a law is content-based if it draws distinctions that depend on the message that a speaker conveys). A content-based restriction is subject to strict scrutiny, which requires a compelling state interest that the restriction is narrowly tailored to serve.  Reed v. Town of Gilbert, 576 U.S. 155, 163, 165 (2015).  The restriction on explicitly discriminatory criteria is "necessary," R.A.V. v. City of St. Paul, 505 U.S. 377, 395 (1992), to serve the compelling interest of ending discrimination against persons in specified statuses.  No alternative, content-neutral form of regulation is available. This absence of a viable alternative is just as apparent in the context of public accommodations as it is in employment.  See, e.g., Blow v. North Carolina, 379 U.S. 684, 684–85 (1965) (per curiam) (applying the federal public

28

accommodations statute to the Plantation Restaurant, a diner that "served whites only and carried a sign to that effect on its front door"). Consequently, Defendant cannot claim First Amendment protection for its explicitly discriminatory criterion.

For the foregoing reasons, if forced to rule on this incomplete record, I would reverse the district court's grant of summary judgment to Defendant and remand for further proceedings.

D.     Conclusion

The federal doctrine of constitutional avoidance, Oregon's application of the same principle, and the Erie doctrine emphatically support, if not require, that we decline to decide the constitutionality of the Oregon statute without first deciding whether the statute even applies to Defendant. The district court erred by contradicting those principles, and the majority opinion repeats the error.

Moreover, the majority opinion is fatally inconsistent: it holds both that the OPAA is assumed to apply to Defendant and that Defendant is so selective that it is not offering a place or service to members of the public. If Defendant is merely selectively choosing "performers" to participate in its pageants, such that it does not offer a place or service to the public at all, Abraham, 511 P.3d at 1093 n. 6, then the OPAA does not apply, and no constitutional claim arises, making the discussion of the First Amendment improperly advisory, Poe, 367 U.S. at 503. But if the OPAA does apply, as the majority opinion inappropriately assumes, then as a

29

matter of Oregon law Defendant serves at least a subset of the general public. Abraham, 511 P.3d at 1089–90. The OPAA's requirement that Defendant not discriminate in its provision of services to the public on the basis of sex or gender identity neither improperly compels Defendant to speak nor violates Defendant's freedom of association. Thus, it cannot prevail on the merits of an as-applied First Amendment claim. Because the majority opinion inappropriately seeks to have it both ways, and does so without first determining which option is the legally correct one, I must dissent.